EUGENE T. SINGER, Appellant and Respondent, *v.* YOKOHAMA SPECIE BANK, LTD., Defendant, and ELLIOTT V. BELL, Superintendent of Banks of the State of New York, as Liquidator of YOKOHAMA SPECIE BANK, LTD., Respondent and Appellant.

Argued January 11, 1949; decided April 14, 1949.

*Albert R. Connelly, George M. Billings* and *Jack W. Robbins* for plaintiff, appellant and respondent. I. The provisions of Executive Order No. 8389 did not prevent the accrual of plaintiff's claim as a preferred creditor of Yokohama Specie Bank within the meaning of subdivision 4 of section 606 of the New York Banking Law. (*Sokoloff* v. *National City Bank,* 250 N. Y. 69; *Matter of Goebel,* 295 N. Y. 73; *Yokohama Specie Bank, Ltd.,* v. *Milbert Importing Corp.,* 182 Misc. 281; *Banque Mellie Iran* v. *Yokohama Specie Bank, Ltd.,* 188 Misc. 346; *Cable & Wireless, Ltd.,* v. *Yokohama Specie Bank, Ltd.,* 191 Misc. 567.) II. The Treasury Supervisor was without power to prevent the acts and transactions of the New York agency from having their normal legal effect. (*Alexewicz* v. *General Aniline & Film Corp.,* 181 Misc. 181; *Addison* v. *Holly Hill Fruit Products,* 322 U. S. 607.) III. Federal freezing control policy favored the adjudication of claims upon even those transactions which were required to be licensed where payment or transfer of title remained subject to license requirements. (*Commission for Polish Relief, Ltd.,* v. *Banca Nationala a*

*Rumaniei,* 288 N. Y. 332.) IV. Payment of the claim and judgment has been authorized by the Federal authorities. The Treasury authorized payment on January 14, 1942, and on October 29, 1942. V. A Treasury license was not necessary after the Alien Property Custodian assumed jurisdiction over the State liquidation proceeding. VI. The Alien Property Custodian has specifically authorized the Superintendent to pay the claims of all creditors of the bank preferred under the New York Banking Law. (*Commission for Polish Relief, Ltd.,* v. *Banca Nationala a Rumaniei,* 288 N. Y. 332; *United States* v. *Pink,* 315 U. S. 203.)

*Edward Feldman, Henry L. Bayles* and *Daniel Gersen* for defendant, respondent and appellant. I. The prohibitions of Executive Order No. 8389 and of the Treasury Supervisor in charge of the agency prevented the creation of any obligation in favor of Standard Oil Company. (*Leeds* v. *Guaranty Trust Co. of N. Y.,* 65 N. Y. S. 2d 431, 272 App. Div. 909, 297 N. Y. 1019; *Clark* v. *Propper,* 169 F. 2d 324; *Legniti* v. *Mechanics & Metals Nat. Bank,* 230 N. Y. 415.) II. Transactions governed by the provisions of Executive Order No. 8389 are void unless licensed. (*Leeds* v. *Guaranty Trust Co. of N. Y.,* 65 N. Y. S. 2d 431, 272 App. Div. 909, 297 N. Y. 1019; *Miyuki Okihara* v. *Clark,* 71 F. Supp. 319; *Clark* v. *Propper,* 169 F. 2d 324; *Markham* v. *Taylor,* 70 F. Supp. 202; *Bernstein* v. *N. V. Nederlandsche-Amerikaansche,* 76 F. Supp. 335, 79 F. Supp. 38.) III. The intervention by the Treasury Supervisor in the affairs of the agency deprived the agency of the power to incur enforcible legal obligations without his consent. (*Alexewicz* v. *General Aniline & Film Corp.,* 181 Misc. 181.) IV. Executive Order No. 8389 prohibits the payment of plaintiff's claim until licensed. No such license has ever been issued. It follows that plaintiff is not entitled to any interest whatsoever upon his claim and that payment to him of any judgment entered herein should be conditioned upon the procurement of an appropriate license. (*Varick Spring Corp.* v. *Bank of United States,* 149 Misc. 908, 240 App. Div. 968, 264 N. Y. 297; *Ruppert Realty Corp.* v. *Bank of United States,* 156 Misc. 93, 249 App. Div. 721, 276 N. Y. 629; *Bollack* v. *Societe Generale,* 263 App. Div. 601; *Singer* v. *Yokohama Specie Bank, Ltd.,* 293 N. Y. 542; *Commission for Polish*

*Relief, Ltd.,* v. *Banca Nationala a Rumaniei,* 288 N. Y. 332; *Feuchtwanger* v. *Central Hanover Bank & Trust Co.,* 288 N. Y. 342; *H. P. Drewry, S. A. R. L.* v. *Onassis,* 188 Misc. 912, 272 App. Div. 870; *Moscow Fire Ins. Co.* v. *Heckscher & Gottlieb,* 260 App. Div. 646.) V. Neither the license of January 14, 1942, nor the Treasury letter of October 29, 1942, licensed the payment of the claim in suit. (*Singer* v. *Yokohama Specie Bank, Ltd.,* 293 N. Y. 542; *Commission for Polish Relief, Ltd.,* v. *Banca Nationala a Rumaniei,* 288 N. Y. 332; *Feuchtwanger* v. *Central Hanover Bank & Trust Co.,* 288 N. Y. 342; *H. P. Drewry, S. A. R. L.* v. *Onassis,* 188 Misc. 912, 272 App. Div. 870; *Bollack* v. *Societe Generale,* 263 App. Div. 601.) VI. None of the documents issued by the Alien Property Custodian licensed payment of the claim in suit. VII. Plaintiff's claim did not arise out of a transaction had by Standard Oil Company with the New York agency. VIII. Executive Order No. 8389 prevents the accrual of plaintiff's claim as a preferred creditor of the agency. (*Legniti* v. *Mechanics & Metals Nat. Bank,* 230 N. Y. 415; *Carr* v. *Bell,* 144 F. 2d 47, 323 U. S. 786; *American Sur. Co.* v. *Philippine Nat. Bank,* 245 N. Y. 116.)

*James L. Morrisson, David L. Bazelon, John F. X. McGohey* and *J. Roger Wollenberg* for United States, *amicus curiæ,* in support of defendant-appellant's position. I. In the absence of an appropriate Federal license, Executive Order No. 8389 and rulings issued pursuant thereto prohibited not only the payment of plaintiff's claim but also the creation of any obligation to pay on the part of the agency. (*Singer* v. *Yokohama Specie Bank, Ltd.,* 293 N. Y. 542; *Alexewicz* v. *General Aniline & Film Corp.,* 181 Misc. 181.) II. No license authorizing the creation of an obligation on the part of the agency or the payment of plaintiff's claim has ever been issued.

FULD, J. This case and its companion, *Banque Mellie Iran* v. *Yokohama Specie Bank* (299 N. Y. 139) which we also decide today, arise out of the liquidation by the State Superintendent of Banks, of the New York Agency of Yokohama Specie Bank, Ltd., a Japanese national bank (hereinafter referred to as the New York Agency or as the Agency).

By the judgment before us, the Superintendent, as liquidator, is ordered to pay the principal of plaintiff's preferred claim

against the New York Agency, together with interest from October 29, 1942. It is our conclusion that such payment has not been authorized in the manner required by applicable Federal freezing controls, and that the judgment appealed from must, consequently, be reversed.

The transaction here engaging our attention falls within the ambit of Federal orders and regulations which became effective in July, 1941, a month before the acts underlying plaintiff's claim were performed in Japan (Executive Order No. 8832; Code of Fed. Reg., Cum. Supp., tit. 3, p. 969 [1941]). By that executive order, existing controls on the domestically-situated assets and property of nationals of certain foreign countries were extended to include the nationals of Japan. In general, the controls prevented any dealings in assets in blocked accounts unless licensed by the United States Treasury Department (Executive Order No. 8389; Code of Fed. Reg., Cum. Supp., tit. 3, p. 645 [1940]). Judicial as well as voluntary transfers were interdicted if such authorization was not obtained (U. S. Treasury General Ruling No. 12; Code of Fed. Reg., Cum. Supp., tit. 31, p. 8849 [1942]).

A survey of the underlying facts leaves no doubt that plaintiff's claim rests upon a transaction which was subject to the licensing requirements. In point of fact, we so ruled in 1944, when this litigation was before us in an earlier phase — on appeal from an order granting defendant's motion for summary judgment. (See *Singer* v. *Yokohama Specie Bank,* 293 N. Y. 542, 550.) Our detailed narrative on that occasion, we but briefly review here.

Plaintiff sought to establish his status as a preferred creditor of the New York Agency as a result of a transfer of funds, by forward foreign exchange contracts, to his assignor, the Standard Vacuum Oil Company (hereinafter called Standard). The underlying dealings reached their culmination on August 29, 1941, when the Yokohama office of Standard delivered to the Yokohama Specie Bank in Japan the yen equivalent of $557,561.25, with instructions to pay that amount to Standard in New York. The bank cabled necessary orders to its New York Agency and the Agency straightaway advised Standard by telephone and letter that it was in receipt of payment instructions and that funds were available. The letter concluded with the statement that "We understand that you [Standard] are filing

an application with The Treasury Department of the U. S. A. for a License in order to permit us to make this payment to you."

Without delay, Standard applied for a license and in December, 1941, renewed the application. Both requests were, as presently will appear, categorically denied by the Federal authorities early in 1942.

In the meantime, the Japanese struck at Pearl Harbor, and on the day following, December 8, 1941, simultaneous with our declaration of war, the State Superintendent of Banks took possession of the New York Agency and its funds, for purposes of liquidation in accordance with the provisions of the Banking Law. Some months later — on November 21, 1942 — plaintiff, as Standard's assignee, filed with the Superintendent a claim for $557,561.25 against funds of the New York Agency in the Superintendent's possession. After the Superintendent had rejected the claim upon the ground that applicable law did not authorize its recognition, plaintiff brought suit in August, 1943, for an adjudication that his claim was one " arising out of a transaction " with the New York Agency and entitled to preference under this State's Banking Law (§ 606, subd. 4).

The lower courts awarded summary judgment in defendant Superintendent's favor. It was their view that the New York Agency, never having promised to pay Standard, had never incurred binding liability, and, since that was so, they concluded that plaintiff's claim did not arise " out of a transaction " with the Agency within the meaning of the Banking Law provision.

On appeal, the Superintendent urged that this was the correct construction of State law; and, joined by the United States as *amicus curiæ*, also contended that Federal law, as embodied in the freezing controls, barred judicial recognition of plaintiff's claim, for the reason that such recognition would effect a prohibited transfer of blocked assets. We reversed on the question of State law, holding that plaintiff would — if he proved his allegations — establish an " enforcible legal obligation by the New York Agency ", entitled to preference under the Banking Law (293 N. Y., *supra*, at pp. 549-550). However, impressed with the arguments advanced by defendant and the Government, based upon the effect of the freezing regulations,

we were careful to provide that plaintiff's payment was to be conditional upon his obtaining a Treasury license. On that point, our opinion brooks no argument. We recognized, we said, that '' Federal regulations governing transactions in foreign exchange prevent the payment to Standard until a license under Executive Order No. 8389  *  *  *  is procured '', and we went on to say that '' Any payment of funds by Yokohama Specie's New York Agency to Standard as an incident of such transaction is subject to the provisions of Executive Order No. 8389, as amended '' (293 N. Y., *supra,* at p. 550).

At that time, there were in the record before us certain documents, bearing both generally and specifically upon the question of Federal clearance of this transaction. Among them were two papers which are now relied upon by plaintiff as establishing Treasury approval. We certainly did not at the time accord those documents that effect, as the language quoted from our decision clearly demonstrates. Indeed, it is interesting to note that plaintiff himself did not so regard them, for he flatly declared that, if his claim were recognized as one entitled to a preference under State law, he would '' thereafter '' apply for the necessary Treasury clearance before he sought to enforce payment. Accordingly, when the Superintendent, on motion for reargument, maintained that our decision had flouted and violated Federal freezing controls, we could not agree. Reasoning that payment of plaintiff's claim remained conditional upon, and subject to, his '' thereafter '' procuring authorization in accordance with those regulations, we refused a rehearing (294 N. Y. 689).

The net effect of our decision was to deny the Superintendent's motion for summary judgment and to remit the matter for trial. That trial has now been held, and plaintiff's proof has satisfied both lower courts that the matters which we had earlier assumed to be true were true and that plaintiff has a claim entitled to recognition under the Banking Law. The record unquestionably sustains that finding.

In addition, the lower courts have now gone further and have held that plaintiff is entitled to immediate payment of his claim, with interest from October 29, 1942.

We believe that this conclusion is erroneous. If payment is to be ordered, it can only be done — and plaintiff acknowledges

this — on the basis of proof that plaintiff's claim has been licensed by Federal authorities; otherwise, the combined result of our decisions in this and the earlier *Singer* appeal (*supra*) would be to set at naught the Federal freezing controls program. We find no evidence of the necessary authorization. Not only is plaintiff unable to point to any treasury communication which is specifically addressed to his claim and authorizes its payment, but all the papers which relate in express terms to his claim explicitly withhold Treasury clearance. Nor, in our judgment, do the generally-worded documents upon which plaintiff relies license payment.

The first document to be considered is a communication, labeled a "License", dated January 14, 1942. Neither of the courts below found authorization in this letter, and, as already indicated, we agree with that conclusion. With the Superintendent of Banks in control of the branches of various foreign banks in New York State, including the New York Agency, the Federal Reserve Bank, on behalf of the Secretary of the Treasury, issued a general license, authorizing the Superintendent to make payment to depositors and to perform all other acts appropriate to orderly liquidation of the local assets of the Agency and nine other foreign banking corporations. The license expressly excluded from its scope transactions " involving a blocked national other than the bank in liquidation ". Both the Yokohama office of Yokohama Specie Bank, Ltd., and Standard's branch office in Japan fell within that description: both were Japanese corporations and were, therefore, "blocked nationals." As a consequence, the transmittal of funds which they directed constituted a prohibited transfer and could be effected — we quote from the letter — "only as authorized by a general or specific license." Plaintiff, claiming under such a transfer, was not freed from the necessity of showing that consummation of the transfer was elsewhere authorized.

If there could be the least doubt that the January 14th license was not intended to clear plaintiff's claim, that doubt is laid at rest by consideration of a few of the attendant circumstances. On the day before the license was issued — January 13, 1942 — the Treasury Department specifically and in so many words denied the application for a clearance which Standard submitted on December 29, 1941. And, on the very same

day that the letter was issued — January 14th — the Treasury again notified Standard that its request for payment was rejected, this time in explicit denial of Standard's first application for clearance, dated August 29, 1941.

As noted, the lower courts did not read the January 14th paper as authorizing payment of plaintiff's claim. They did, however, take the view that payment was permitted by a second letter sent by the Federal Reserve Bank to the " Yokohama Specie Bank, Ltd., New York Agency, c/o Supt. of Banks of the State of New York ". That letter read in this way:

" Reference is made to Supervisory Order No. 27, executed on September 23, 1942, by the Alien Property Custodian.

" In view of such order, *you are authorized by the Treasury Department, so far as Executive Order No. 8389, as amended, is concerned, to engage in any transaction on or after October 29, 1942, which might be engaged in without a specific license of the Treasury Department by a person who is not a national of any blocked country.*

" License No. NY 338836–SU is hereby revoked insofar as it applied to Yokohama Specie Bank, Ltd., New York Agency.

" It is suggested that you communicate with the office of the Alien Property Custodian concerning the applicability to your enterprise of any orders, rulings or regulations of such office." (Emphasis supplied.)

In claiming that the italicized sentence constitutes the essential authorization, plaintiff has misconstrued the letter's purpose and has misread its language. At the very most, the communication authorized the Superintendent to engage in noncontrolled transactions that came into existence " on or after October 29, 1942," not before that date. The letter is prospective; it looks to the future, not to the past. Indeed, it could not retroactively authorize past transactions, for General Ruling No. 4 of the Treasury Department (Code of Fed. Reg., 1943 Supp., tit. 31, p. 1307) expressly provided that no license or other authorization issued by the Treasury should be deemed to " authorize or validate any transaction effected prior to the issuance thereof, unless such license or other authorization specifically so provides." There is, of course, no suggestion that the October 29th letter came within the exception to the ban on retroactive licenses; it contains nothing which can be read

as a specific exemption from the coverage of the quoted provision. It follows that the maximum effect of the October 29th letter was to license otherwise uncontrolled transactions which occurred thereafter.

Clearly, then, it constitutes no authorization, for payment may not be treated as " a transaction " separate and apart from the dealings which brought the claim into being. Payment is but " an incident " of the transaction (293 N. Y., *supra*, at p. 550). The " transaction ", having occurred in 1941, was, of necessity, " engaged in " before October 29, 1942. It is of more than passing significance that the plaintiff had unsuccessfully applied for payment on two separate occasions in 1941; the circumstance that payment was again sought after October, 1942, could not, in any event, bring the matter within the coverage or the effect of that communication.

We go further, however. Even if we were to assume that payment could constitute a " transaction   *   *   *   after October 29, 1942," it is not of the type which is sanctioned by the Treasury letter. The Superintendent was thereby empowered to engage only in those transactions which might be carried on " without a specific license of the Treasury Department by a person who is not a national of any blocked country." Patently, payment of plaintiff's claim does not fall within that category. Since the transfer of funds involved the foreign office of the Yokohama bank and Standard's Japanese office, both nationals of Japan, and was to be performed at the direction of the foreign bank, it was a prohibited transfer and not a " transaction   *   *   *   which might be engaged in without a specific license   *   *   *   by a person who is not a national of any blocked country."

This conclusion, it is evident, is required by the October 29th letter itself. The patent purpose of that communication was to place the New York Agency, with respect to transactions covered by the Executive Order, in the same position as any domestic bank. Let us assume, for instance, that the Yokohama bank in Japan had instructed, not its New York Agency but some domestic bank to pay out to Standard funds of the Japanese bank there deposited. In such a case, we unquestionably would have a " transaction to be performed at the direction " of an enemy national, the Yokohama bank, and refusal of a license

would plainly have been dictated (General Ruling No. 12, *supra*). Since, obviously, the Agency was in no better position than a domestic bank, and since the transaction could not have been " performed " by a national of this country " without a specific license ", it inevitably follows that payment could not be made by the Agency without such explicit authorization.

The effect of the October letter was but to advise the Superintendent that the Alien Property Custodian had taken control of enemy business enterprises and banks on behalf of the Federal Government and that thenceforward the Custodian would have primary responsibility for Federal supervision of the Agency. It did not eliminate plaintiff's need for clearance and that view, it may be repeated, was clearly reflected in our utterances on the prior appeal.

The other documents upon which plaintiff relies as authorizing his payment may be dismissed with but passing mention.

A supervisory order — issued on September 28, 1942, by the Alien Property Custodian — was merely a recital that, " to the extent deemed necessary or advisable ", the New York Agency was to be supervised in its dealings and payments by the Custodian. Nothing in the order intimated that it was intended to license or to authorize a transaction prohibited generally by the Executive Order. On the contrary, instead of relaxing restrictions, it made liquidation of the New York Agency subject to further regulatory authority. Only by doing violence to both the language of the order and the spirit of the Federal controls system and its regulations, could we conclude that the surrender of Treasury supervision to the Custodian was intended to defrost, at one stroke, all of the frozen accounts of enemy nationals.

Indeed, the Custodian made this plain by a letter of the same date, the next of the papers referred to by plaintiff. In essence, it instructed the Superintendent to continue liquidation of the New York Agency, subject to the additional controls outlined in the supervisory order. This was accomplished by requiring that there be submitted to the Custodian, in his discretion, any claims then before the Superintendent. Far from constituting blanket authority to the Superintendent to pay all and sundry claims pending, the letter was an affirmation that the Custodian would thereafter reserve a veto power, even as to those claims

which the Superintendent himself recognized. It is upon this ground that the United States Government presses its further point, which we neither pass upon nor consider, that not only a Treasury license but an authorization from the Custodian as well is necessary before plaintiff's claim may be paid.

The final document to which plaintiff points is Vesting Order No. 915 of February 15, 1943. The Custodian, by that order, vested in the United States " The excess proceeds of the business and property in the State of New York of The Yokohama Specie Bank, Ltd.," with the explicit proviso that it did not affect the Superintendent's power to continue liquidation. Of course, this vesting order did not authorize the Superintendent to do anything new; it merely reaffirmed his existing power, and that, we have seen, did not include authority to pay plaintiff's claim.

The conclusion which we thus reach — that payment of plaintiff's claim has not been licensed — is compelled, then, not only by the theory and rationale of our earlier decision in this matter, not only by the tenor of the orders and communications of the Treasury Department and of the Custodian, but also by the basic scheme and the ultimate objectives of the program carefully worked out by the Federal Government for the control of enemy alien and other foreign funds. The consistent design of that program is to prevent the fruits of prohibited transactions from being harvested until the underlying dealings are screened and found to be consonant with the national interests. The entire program, its purpose and its design, would be completely upset and nullified if we were to give to the documents before us the carte blanche licensing effect sought by plaintiff. Such a decision would place in the same category, on a par, all sorts of foreign exchange contracts emanating from blocked nations during the prehostilities period, and it would validate, willy-nilly and in gross, all such transfers, irrespective of how illegal may have been their source, regardless of how illicit may have been their purpose. Manifestly, the language of the papers before us cannot be read to produce such a result.

And, since payment has not yet been licensed, plaintiff is not entitled either to the principal of the claim or to the accrual of interest thereon. (See, e.g., *Moscow Fire Ins. Co.* v. *Heckscher & Gottlieb,* 285 N. Y. 674, affg. 260 App. Div. 646, 650;

*Donnelly* v. *City of Brooklyn,* 121 N. Y. 9, 19–20; *McCloskey* v. *Brown,* 271 App. Div. 772.)

The judgments should be reversed, without costs, and the case remitted to the Trial Term for the entry of judgment in accordance with this opinion. [See 299 N. Y. 791.]

LOUGHRAN, Ch. J., LEWIS, CONWAY, DESMOND and DYE, JJ., concur.

Judgments reversed, etc.