Van Voobhis, J.
(dissenting). The complaint, in an action to recover money received by defendant for an unused letter of credit, has been dismissed after a trial, on the ground that there was failure of proof concerning the law of China, where the cause of action arose, and failure to establish that the plaintiff sued the right party by suing the defendant instead of Stabilization Board of China. The answer further alleges, in effect, that the Stabilization Board (now known as Central Bank of China) is or may be the real party in interest, rather than the plaintiff, and that, in any event, there are Chinese exchange regulations now in force prohibiting the transfer of funds, which regulations it is claimed would be thwarted if judgment were awarded to the plaintiff.
Reduced to its essentials, this transaction involved a purchase for a particular purpose of United States exchange by plaintiff from defendant, in order to execute which defendant had to purchase a like amount of exchange from the Stabilization Board of China. The latter was an instrumentality created by the Governments of the United States, Great Britain and China. It is sometimes spoken of in the record as an agency of the *395 Government of China. Its purpose was to regulate and to facilitate imports into China, and it was endowed with public funds (by the United States) for the purchase of United States dollars to increase Chinese imports. It appears to have been given regulatory power over all transactions in foreign exchange, so as to insure that the limited' quantity of goods that Chinese exports and foreign aid enabled China to import, would be such as could be devoted to the most essential requirements of the Chinese Government and people.
The decision of this action does not require complete knowledge or analysis of the regulatory powers of the Stabilization Board, inasmuch as it approved the purchase by plaintiff from defendant of the exchange involved in this lawsuit, and the terms and conditions on which it was bought. Whether or not the Board or its successor, Central Bank of China, is involved in this transaction in such manner as to defeat plaintiff’s claim, depends, therefore, not upon its power to regulate Chinese import and exchange transactions, but upon its private or proprietary status, as the vendor to defendant of the United States currency which defendant sold to plaintiff. Since it was the ultimate source of this foreign exchange, if for no other reason, it was able to and did direct and approve the form of these dealings between plaintiff and defendant, but its rights, and those of the parties to the action, must be judged on the basis of the written contracts and other transactions as they were entered into, and not on a theory that the Stabilization Board enjoys superior status due to its having been a government instrumentality, or that it could be lawgiver and litigant at the same time. It and the defendant are subject to the usual rule that where, as here, the evidence establishes prima facie that a plaintiff and a defendant are the real parties in interest, the plaintiff is entitled to succeed on that issue unless the defendant shows more than a mere assertion by a third party, not supported by evidence, that such third person is the real party in interest. That much would be required in order to enable a defendant to obtain an order of interpleader (Pouch v. Prudential Ins. Co., 204 N. Y. 281; see cases cited at pp. 286-287).
The documentary evidence establishes that plaintiff’s application to purchase United States exchange was made to defendant, and not, as intimated in the majority opinion, to the Stabilization Board (Exhibit 1 attached to deposition of S. J. H. Fox, application blank dated October 15, 1941, signed by plaintiff and addressed to defendant, entitled “ Application by Importers *396 to an Authorized or Licensed Bank for Foreign Exchange to Finance Imports Permitted by the Stabilization Board of China”). This was a full and formal application, which ripened into a contract between plaintiff and defendant upon defendant’s crediting plaintiff with exchange for the purpose mentioned. The transaction did not cease to be between plaintiff and defendant, notwithstanding that defendant could procure the necessary exchange to carry out this agreement only by purchasing it from the Stabilization Board, which had control over the entire foreign exchange situation in China, and had to approve the nature of the imports to be financed by any foreign exchange transaction. There is no evidence to indicate, as contended by defendant, that a bank described as ‘6 an Authorized or Licensed Bank for Foreign Exchange to Finance Imports Permitted by the Stabilization Board of China ’ ’ became agent for the Stabilization Board, or that the latter assumed to act as banker-principal in foreign exchange transactions vis-a-vis the "customers of all authorized or licensed banks. The Stabilization Board would hardly have undertaken to assume such wide responsibilities and liabilities to customers of banks with which it dealt, nor is there any evidence to support such a conclusion. The reverse is indicated by the deposition of William Cecil Cassels, Alternate to the British Member of the Stabilization Board, who testified as to the meaning of these terms. He stated that ‘ ‘ 1 Licensed ’ refers to banks licensed by the United States Executive Orders ”, and that “ 1 Authorized ’ refers to banks authorized by the United Kingdom to undertake certain operations.” He added that “ ‘ Appointed ’ refers to banks appointed by the Chinese government to deal in foreign exchange ”, and stated that “ The term ‘ appointed banks ’ was only adopted by the Stabilization Board in November, 1941, and prior to that, banks permitted to operate exchange were referred to as licensed or authorized banks.” It is apparent that none of these designations expresses or implies that defendant became the alter ego or agent for the Board. They signify merely that such banks had a standing that was sufficiently well recognized for the Stabilization Board to deal with them. Following plaintiff’s application to defendant, the latter, in turn, submitted its own “ Application to the Stabilization Board of China for the Purchase of Foreign Exchange by an Authorized or a Licensed Bank on Behalf of its Clients for Import Requirements ”, dated October 31, 1941 (Exhibit 0 attached to deposition of S. J. H. Fox).
The circumstance that the Stabilization Board, or its successor, Central Bank of China, has notified such banks that it still has *397 some interest in these accounts (its claims being clearly against the banks and not their customers, as the analysis hereinafter made shows) does not indicate that these funds were “ blocked ” within the usual meaning of that term. Any existing Chinese exchange restrictions can be safeguarded in the judgment, but without precluding an adjudication in plaintiff’s favor, under the ruling in Singer v. Yokohama Specie Bank (299 N. Y. 113).
In spite of many complications, the simple fact emerges that plaintiff paid to defendant, in Chinese currency, the equivalent of 7,000 United States dollars for which it has received nothing in return, except the issuance of an unused letter of credit. The attack on Pearl Harbor occurred three days later, and the war in the Pacific prevented sending the merchandise to China. The letter of credit expired on February 15,1942.
Plaintiff is a New York corporation. Defendant is a foreign corporation, admitted in the answer to have been “ organized in the Colony of Hong Kong It is engaged in banking in the State of New York with its principal office at 72 Wall Street, New York City, and it maintained, at least prior to Pearl Harbor, a branch office in Shanghai, China.
Plaintiff’s case was supported by what appears to have been all of the documentary and other evidence available. New facts are not likely to be developed by further investigation, and, although the complaint was dismissed without prejudice, the judgment appealed from will probably result in preventing the plaintiff from satisfying its claim out of the American assets of the defendant. Plaintiff succeeded in proving enough to call upon defendant to assume the burden of going forward with the evidence to establish the defenses that plaintiff has sued the wrong party, that plaintiff is not the real party in interest, or that plaintiff is precluded from recovery by Chinese law as it existed in 1941, or by Chinese exchange restrictions now in force. The possibility that defendant acted as agent for the Stabilization Board, or that the latter is the real party in interest is remote, and based on pure speculation.
Specifically, the documentary evidence discloses the following facts:
On October 15, 1941, plaintiff made its written application to defendant for the purchase of $14,000 in United States currency for the issuance of a letter of credit to be drawn on by Lubell-Hochmeyer, Inc., 188 William Street, New York City, for a shipment of leather butts for shoes to plaintiff in Shanghai. Defendant in turn on October 31, 1941, applied to the Stabiliza *398 tion Board to purchase American exchange for various customers, including this amount for plaintiff. The Stabilization Board consented to sell to defendant $7,000, instead of $14,000, for the purposes of this transaction. The record contains a memorandum of transfer showing that on November 21, 1941, the Stabilization Board credited defendant with 122,740.10 United States dollars; and another similar memorandum, entitled “ Transfer Stabilization Board Contract ”, dated December 4, 1941, sets forth that defendant credited plaintiff with $7,000 United States currency for which plaintiff paid to defendant 132,544.38 in Chinese dollars. Plaintiff’s cancelled check to defendant for the latter sum dated December 3, 1941, is in evidence. It is thus clearly established that on December 4, 1941, plaintiff was credited by defendant with $7,000 in United States money, which plaintiff had bought at the then exchange rate, and which was retained by defendant against the issuance of said letter of credit. The letter of credit lapsed due to no fault of the plaintiff, and neither the United States money nor the Chinese money which went to purchase it has ever been restored to plaintiff.
It is true that this exchange was sold to plaintiff subject to an important limitation formulated by the Stabilization Board, which was expressed both in the application by plaintiff to defendant and in the corresponding application by defendant to the Board. This was intended to make certain that the exchange would be utilized only to pay for the importation of authorized merchandise into China from the United States. This clause in the application by plaintiff to defendant bank reads: “ I/we unconditionally agree to resell to the Bank at the rate at which purchased any or all of the aforementioned foreign exchange acquired pursuant to this application in the event that the foreign exchange herein applied for is subsequently found not to have been used for the purpose of financing imports as described herein.” The corresponding clause in the defendant’s application to the Board stated that “we will re-sell to the Stabilization Board of China at the rate at which purchased, any or all of the foreign exchange acquired pursuant to this application which is not used for the purpose of covering the financing of the import transactions described in the attached applications either because the exchange in the amounts applied for was not required by the importer or because of repurchase by us at the direction of the Stabilization Board of China, or repurchase for any other reason, of exchange sold by us pursuant to the attached applications.”
*399 These clauses in the contracts clearly defined the obligations of the parties. If, as happened, this foreign exchange supplied to plaintiff by defendant was not used for the purpose of financing these imports, plaintiff was not permitted to make a profit out of the monetary transaction if Chinese currency depreciated in value. Plaintiff was thus obligated to resell to defendant, at defendant’s option, this $7,000 in United States currency at the same rate of exchange at which it had been purchased. This meant that after expiration of its letter of credit, plaintiff was entitled to demand that defendant pay to it, as defendant might elect, either the said $7,000 in United States currency or the 132,544.38 dollars in Chinese currency which plaintiff had paid to defendant at Shanghai on December 3, 1941, less whatever charges and expenses defendant was entitled to deduct for establishing the letter of credit.
The Stabilization Board had protected itself in similar fashion by providing, in its contract with defendant, that the latter would be obliged to resell to it the same amount of United States currency, for the same sum in Chinese money which defendant had paid to the Board when the defendant purchased the said United States currency from the Board at about the same time.
This documentary evidence demonstrates that plaintiff’s dealings were with defendant, and that the obligation of defendant to plaintiff ought not to be defeated by reason of defendant’s transactions with the Stabilization Board. Legally, defendant’s relations with the Stabilization Board constituted an independent transaction. Probably plaintiff would not have been confronted with this difficulty had not the general secretary of the Stabilization Board, at the time when its functions and assets were being taken over by the Central Bank of China at the close of 1944, written a general letter to all “ authorized or licensed banks ”, stating in substance that the claims and counterclaims between the Board and such banks, arising from accounts such as this, would have to be settled after the war, and that such banks could not wind up these accounts without regard to whatever rights might belong to the Stabilization Board. This warning was reiterated by a circular letter from the Central Bank of China dated February 12, 1946. Whatever obligation there may be on the part of defendant to Central Bank of China should not interfere with the enforcement of defendant’s liability to plaintiff. No one appears to know or to be able to discover what is the present status of Central Bank *400 of China, and the prospect of plaintiff’s being able to join it as a party defendant in this action would appear to be dull.
Commencing in 1946, there was a catastrophic depreciation in the value of Chinese money, with the consequence that the amount which plaintiff paid to defendant in 1941 is now worth little more than a nominal sum.
The complaint alleges that two weeks after the expiration of this letter of credit, and on March 1, 1942, plaintiff requested defendant’s branch bank in Shanghai to credit plaintiff’s bank account with defendant in Shanghai with the sum of $7,000 or its equivalent amount in Chinese dollars, so that plaintiff could draw this money from its bank account with defendant in Shanghai. Following the onset of the Japanese war, the Japanese armed forces occupied Shanghai and closed the Shanghai branch of the defendant bank, placing it in liquidation, and appointed the Japanese Yokohama Specie Bank as liquidator. It seized all of the assets of defendant’s Shanghai branch, which ceased to function as a branch of defendant. On December 18, 1941, the head office of the bank appears to have been transferred temporarily to London, England, by order in council. These events may have had, and probably did have, the effect of nullifying the said demand on the Shanghai branch alleged to have been .made on March 1, 1942, even without the added force given to such a conclusion by section 204-a of the Banking Law.
It may well be that, except as affected by the Japanese occupation of Shanghai, a demand made upon defendant on March 1, 1942, would have matured an obligation on the part of defendant to pay to plaintiff the 132,544.38 Chinese dollars as of that date. That was before there had been serious depreciation in the value of Chinese money, and, unless the Japanese invasion had vitiated the demand, it is possible that defendant would have been liable to plaintiff for the present equivalent in value of what that amount of Chinese money was worth on or about March 1, 1942.
The record of this trial does not show the circumstances under which plaintiff claims to have made this demand at Shanghai, nor whether it was made upon the defendant anywhere else. Even in the absence of such a demand at any time, plaintiff would appear to be entitled to an adjudication that defendant should pay to it the present value of its Chinese currency. Although such value might be nominal, that would at least constitute a final determination of the controversy, and enable plaintiff to write the account off from its books. The circumstance that the *401 complaint asks for $7,000 in United States currency does not prevent a recovery. This pleading would entitle plaintiff to recover whatever lesser sum may be owing to it, measured by the value of Chinese currency at the controlling date.
A new trial is clearly necessary to develop these facts and circumstances, as the trial court recognized by dismissing the complaint without prejudice, but it was error to cast upon plaintiff the burden of presenting further evidence respecting Chinese law, or the status of the Central Bank of China as a possible rival claimant to these funds. Enough has been shown prima facie to indicate that plaintiff is entitled to some relief according to the laws of any civilized country, regardless of whether or not the common law or the law merchant is presumed to be in effect there. If there were some law of China in force in December, 1941, or thereafter, which would prevent any recovery by-plaintiff, notwithstanding the unjust enrichment which has resulted to defendant, the burden of going forward with the evidence upon that subject should be held to rest upon defendant.
A recovery by plaintiff could hardly subject defendant to the hazard of having to pay twice, since if defendant satisfies its liability to plaintiff by paying to it the same amount of Chinese dollars, less its fees and expenses, which plaintiff paid to it in December, 1941, defendant will either retain the $7,000 in United States money, or else be compelled to pay it to the Central Bank of China in exchange for approximately the same amount of Chinese money that defendant is called upon to pay to plaintiff. If defendant is obliged to pay substantially more than such a sum to plaintiff, due to having wrongfully neglected to comply with some demand by plaintiff when Chinese money was of greater value than it is now, defendant would not be entitled to be indemnified against the consequences of such conduct. In any event, the burden of -going forward with such evidence has been cast upon defendant, to show that Central Bank of China is the real party in interest.
It is possible, and the “ Temporary Regulations With Regard to Foreign Exchange Transactions ” announced by the National Government of the Republic of China on February 25, 1946, which are in evidence as Exhibit 10, may indicate, that any exchange of United States for Chinese money at the present time is subject to restrictions limiting use for importation into China of goods whose importation is permitted, or for other restricted purposes. Since the close of hostilities, plaintiff has indicated a willingness to use these funds for imports into *402 China, or it is possible that, inasmuch as plaintiff is a New York State corporation, the proceeds of a recovery might remain in the United States without finding their way into China either in the form of money or of goods. These phases cannot be determined on this record, but the possible existence of such restrictions would not necessarily prevent a recovery by plaintiff. If there be exchange restrictions bearing upon the enforcement of a judgment which might be entered herein in favor of plaintiff, the burden is upon defendant to establish them and, if established, the judgment can provide that its enforcement be subject to them (Singer v. Yokohama Specie Bank, 299 N. Y. 113, supra). In no event should the defendant be unjustly enriched, nor plaintiff penalized by an indefinite continuation of the status quo on account of the present condition of the National Government of the Republic of China and its instrumentalities.
The judgment appealed from should be reversed and a new trial granted.
Glennon, J. P., and Callahan, J., concur with Dore, J.; Van Voorhis, J., dissents in opinion, in which Shientag, J., concurs.
Judgment and order affirmed, with costs.