**DEAN WITTER REYNOLDS, INC., Plaintiff,**

v.

**Marilyn Kay FERNANDEZ, etc., et al., Defendants,**

**Banco Nacional De Cuba, et al., Defendants-Cross-Claimants-Appellees,**

**Gilbert McDonald, Defendant-Appellant.**

No. 82–6152.

United States Court of Appeals, Eleventh Circuit.

Sept. 10, 1984.

---

Philip Glatzer, Coconut Grove, Fla., for defendant-appellant.

Michael Krinsky, Rabinowits, Boudin, Standard, Krinsky & Lieberman, New York City, for defendants-cross-claimants-appellees.

Before TJOFLAT and CLARK, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

CLARK, Circuit Judge:

Appellant, Gilbert McDonald, appeals from a final judgment entered November 2, 1982, awarding two Cuban government corporations, Banco Nacional de Cuba and Empresa Cubana Exportadora de Alimentos y Productos Varios (hereinafter "CUBAEXPORT"), a judgment in the sum of $1,334,250 against McDonald and dismissing his counterclaim. The district court had previously granted the Cuban parties' motion for summary judgment on the ground that McDonald had been unjustly enriched by receipt of his portion of the proceeds of a fraud committed against the Cuban parties. On appeal, McDonald argues that the Cuban parties' failure to comply with the Cuban Assets Control Regulations [1] and obtain authorization to sue from the United States Department of Treasury prior to commencing the action deprived the district court of subject matter jurisdiction and, therefore, the judgment is void.[2] We have jurisdiction. 28 U.S.C. § 1291 (1982).

## I.

### A.

In an effort to stifle Cuban efforts to destabilize governments in the Western

---

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. 31 C.F.R. Part 515.

2. Although appellant raised only this one issue on appeal, the panel requested that the parties submit post oral argument memoranda on the question whether ancillary jurisdiction supported the Cuban parties' cross-claim against McDonald. After reviewing the memoranda and the decision of the district court, we are satisfied that ancillary jurisdiction existed.

Hemisphere, the President, on July 8, 1963 issued the Cuban Assets Control Regulations (hereinafter "Regulations"). The Regulations, originally promulgated pursuant to § 5(b) of the Trading With the Enemy Act[3] (TWEA) but now authorized by the International Emergency Economic Powers Act of 1976,[4] prohibit all unlicensed financial and commercial transactions with Cuba or Cuban nationals.[5] A "transaction" generally includes "[a]ny payment or transfer" of property to Cuba or a national thereof.[6] More specifically, a "transfer" includes "the issuance, docketing, filing, or the levy of or under any judgment, decree, attachment, execution, or other judicial or administrative process or order."[7]

The Regulations, in connection with § 5(b) of the TWEA,[8] make it unlawful to effect any of the described transactions unless a license authorizing the transaction has been issued by the Office of Foreign Assets Control acting on behalf of the Secretary of the Treasury or by the Federal Reserve Bank of New York.[9] Licenses can be either general or specific. A general license authorizes a broad class of transactions which the Regulations would otherwise prohibit. All general licenses are set forth in Subpart E.[10] A specific license authorizes an individual transaction not authorized by a general license.[11] Any person having an interest in a transaction or proposed transaction may apply for a specific license.[12] The Office of Foreign Assets Control considers applications on an individual basis and advises each applicant of its decision. The decision to approve or disapprove the application constitutes final agency action.[13]

## B.

On January 10, 1979, Dean Witter Reynolds, Inc. (hereinafter "Reynolds"), a brokerage firm, filed a complaint in interpleader naming Banco Nacional de Cuba and CUBAEXPORT as defendants along with Karl Fessler and others. Banco Nacional de Cuba and CUBAEXPORT are wholly owned corporations of the Government of Cuba with offices in Havana, Cuba.

Reynolds alleged that the defendants had made conflicting claims to the funds and securities standing in Fessler's name on its books and that it was unable to determine to whom the funds and property were due and payable. In a February 9, 1978 order, the district court found that Reynolds' complaint stated a proper claim for interpleader and that the court had jurisdiction over the action. On October 15, 1979, the court ordered Reynolds to use the balance in Fessler's cash credit account to purchase shares in a money market fund in the names of the Clerk of the United States District Court for the Southern District of New York and Karl Fessler, and to deliver the money market shares and the other

3. 50 U.S.C.App. § 5(b).

4. 50 U.S.C. § 1702(a)(1)(B). Although the Regulations were promulgated under the TWEA, the Treasury Department's authority with respect to Cuban assets is currently derived from the IEEPA, which "grandfathered" in all "authorities conferred on the President" by § 5(b) of the TWEA that were "being exercised" on July 1, 1977. Pub.L. 95–223, § 102(b). *See Regan v. Wald,* — U.S. —, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984) (defining "authorities ... being exercised"). The IEEPA restricts some of the Executive's powers in circumstances short of war, but it reenacts, in identical language, "the power to compel the transfer of foreign assets, and to nullify any rights in them." *Unidyne Corp. v. Iran,* 512 F.Supp. 705, 708–09 (E.D.Va.1981). *See Wald, supra,* — U.S. at — & n. 8, 104 S.Ct. at 3031 & n. 8.

5. 31 C.F.R. Part 515, Subpart B.

6. *Id.* § 515.309.

7. *Id.* § 515.310.

8. 50 U.S.C.App. § 5(b).

9. *Id.* § 515.701(a) & .801(b)(6). The IEEPA also establishes civil and criminal penalties for violations of any "regulation issued under [Chapter 35, Title 50, United States Code]."

10. 31 C.F.R., Subpart E, §§ 515.504–.565 (1983). *See id.* § 515.801(a).

11. *Id.* § 515.801(b)(1).

12. *Id.* (b)(2).

13. *Id.* § 515.803.

securities held by it for Fessler's Reynolds account to the Clerk of the Court. The Clerk was ordered to maintain same and all dividends resulting therefrom in his custody subject to further order of the court.

In response to the February 9, 1978 order, Banco Nacional de Cuba and CUBAEXPORT, jointly, and Karl Fessler filed claims to the fund; none of the other parties did. The Cuban parties also filed a cross-claim against the defendants Fessler and Tanvest, N.V., naming Peter Franklin Paul and the appellant here, Gilbert McDonald, as additional defendants. On December 10, 1979, the court denied the motions of Paul and McDonald to dismiss the cross-claims for want of jurisdiction and other grounds. 489 F.Supp. 434.

The same allegations of fact and law supported the Cuban parties' claim to the interpleaded fund and their cross-claim. Banco Nacional de Cuba and CUBAEXPORT alleged that McDonald, Fessler and Paul, together with others, successfully defrauded them of the proceeds of a letter of credit in the sum of $8,775,000. In essence, they alleged that the defendants on the cross-claim, knowing and intending that there would be no shipment of coffee, induced CUBAEXPORT to enter into a purchase contract which provided for payment of the coffee in advance of delivery. They further alleged that these defendants induced Banco Nacional de Cuba to issue a letter of credit at the request of its customer, CUBAEXPORT, for the payment of the purchase price of the coffee upon presentation of documents manifesting that the coffee had been loaded on board a vessel in a port of the Dominican Republic bound for Havana, Cuba; that they knowingly caused documents to be presented under the letter of credit falsely representing that the coffee had been loaded as required by the contract and the letter of credit; and they thereby induced Banco Nacional de Cuba through its agent to issue the letter of credit in the sum of $8,775,000.[14]

McDonald asserted a counterclaim alleging that the Cuban parties had tortiously caused Banco de Iberoamerica of Panama City, Panama, to deliver to them a $700,000 certificate of deposit owned by McDonald. On January 24, 1980, the Cuban parties filed a reply alleging that the certificate of deposit had been delivered to them by order of the Attorney General of Panama. They maintained that the act of state doctrine barred a court of the United States from entertaining the counterclaim in those circumstances and, further, that they were not liable as a matter of substantive law even if the merits of the counterclaim were reached.

On February 23, 1982, the Cuban parties filed a motion for summary judgment. On October 1, 1982, the district court granted the motion, concluding that Banco Nacional de Cuba and CUBAEXPORT were entitled to summary judgment against McDonald and Fessler on the theory of unjust enrichment[15] and that McDonald's counterclaim

---

**14.** In Count Two, Banco Nacional de Cuba and CUBAEXPORT alleged that McDonald, Paul, Fessler and others, received the proceeds of the letter of credit and that the Cuban parties were entitled to restitution because the consideration for that payment, the coffee, had not been delivered. Counts Three and Four alleged breaches of contract and warranty.

**15.** Banco Nacional de Cuba and CUBAEXPORT sought relief in the first instance on the ground that the defendants' liability for the full amount of the proceeds of the letter of credit had been conclusively established by their guilty pleas to criminal charges of fraud. McDonald and Fessler had been charged with the same fraud alleged in the cross-claim by the United States of America in a criminal complaint filed in the United States District Court and thereafter had been extradited to Canada to face criminal charges by the Province of Ontario. (In the transaction, the Bank of Nova Scotia's Toronto branch acted as the advising bank and Banco Nacional's agent. Thus, it was in Toronto that the false documents were presented and payment successfully demanded by the defendants.) After an extensive preliminary inquiry, the Ontario court bound Fessler and McDonald over for trial on the fraud charges. Thereafter, Fessler and McDonald entered a plea of guilty to one of the counts of the criminal complaint charging the same substantive fraud alleged here. The defendant Paul plead guilty to criminal charges in the United States District Court for the Southern District of Florida.

In granting summary judgment, the district court held that Paul's guilty plea and conviction

was without merit. Accordingly, the court ordered that the Cuban parties have judgment against McDonald for the sum of $1,334,250, this amount being equal to the portion of the letter of credit proceeds McDonald had obtained. With regard to Fessler, the court awarded a constructive trust in favor of Banco Nacional de Cuba and CUBAEXPORT over property within the jurisdiction traceable to the letter of credit proceeds, *viz.* the interpleaded fund and certain other tangible property. In addition, the court awarded judgment against Fessler in the sum of $276,396, that amount being equal to the portion of the proceeds received by Fessler which he had not invested in the brokerage account or tangible property within the jurisdiction. On November 2, 1982, the court entered a final judgment consistent with its disposition of summary judgment. McDonald filed a notice of appeal on November 24, 1982.

Subsequently, appellees apparently became concerned over the lack of Treasury Department authorization of their actions in the U.S. District Court. Probably out of an abundance of caution, on April 22, 1983, appellees' counsel contacted by letter the Office of Foreign Assets Control, requesting that a license be issued with respect to the action captioned *Dean Witter Reynolds v. Fernandez v. McDonald & Paul*, No. 79–112 CIV–CA (S.D.Fla.). On May 12, 1983, the office issued license No. C–10024, authorizing the following:

> All transactions relating to the prosecution of the *Reynolds* case up to and including entry of final judgment, provided that any monies or funds awarded to Cuba or a Cuban national must be deposited into an interest-bearing account in a domestic bank, with such account designated as blocked pursuant to the Cuban Assets Control Regulations, and further provided that any other property or as-

sets awarded to Cuba or a Cuban national must be maintained in a blocked status pursuant to the Cuban Assets Control Regulations. (italics original).

The license further provided that the authorization extends "retroactive[ly] to the date of the filing of the *Reynolds* action [*i.e.,* January 10, 1979]."

Appellant raised no challenge to the jurisdiction of the district court based on the absence of a license issued prior to filing suit until the case reached this court.

### II.

This appeal presents both important substantive and procedural issues. The substantive question presented is whether a Cuban national must obtain a license pursuant to the Cuban Assets Control Regulations before initiating an *in personam* lawsuit in a U.S. court. The threshold procedural question is whether this question can be raised for the first time on appeal.

In determining these issues, the nature of a Treasury Department license must be resolved. Appellant argues that the license is jurisdictional in nature. If it is jurisdictional, appellant suggests that he should prevail on both the procedural and substantive issues before this court. First, appellant contends that the issue has not been waived by failing to raise it in the district court because questions of subject matter jurisdiction can be raised at any stage of the proceedings. Second, appellant submits that even though a license was issued retroactively, the proceeding was a nullity because the license was a jurisdictional prerequisite, and jurisdiction is to be determined at the time of filing suit. Appellees adduce that the license is not essential to establish subject matter jurisdiction and further that no jurisdictional doctrines preclude retroactive effect for

were conclusive as to him and entitled the Cuban parties to summary judgment. It ruled otherwise, however, with respect to McDonald and Fessler. Unlike Paul, McDonald and Fessler's convictions had not been before a federal court and thus state rather than the federal law of estoppel applied. The district court was not persuaded that Florida would give conclusive effect to foreign criminal convictions in a subsequent civil case.

the license. Appellees additionally maintain that appellant has waived the issue by failing to raise it below.

■ Whether a license which would authorize judicial proceedings involving Cuban nationals in U.S. courts has jurisdictional implications is unclear.[16] We find that such a license is not jurisdictional in nature and that a federal district court has jurisdiction to entertain a suit such as the one here. The effect of the Regulations is to prohibit, as a matter of the Executive's discretion in the area of foreign affairs, the federal district courts from entering any order or judgment that can be the basis for a transfer of property or funds to a foreign country or foreign national subject to TWEA, unless the Treasury Department has issued the appropriate license.[17] Before reaching this holding, however, we must overcome the procedural bar to ad-

dressing nonjurisdictional questions for the first time on appeal.

### A.

Except for questions concerning the power of the court to order relief,[18] an appellate court generally will not consider a legal issue or theory unless it was presented to the trial court.[19] This principle is not a jurisdictional limitation but merely a rule of practice,[20] and "[t]he decision whether to consider an argument first made on appeal ... is 'left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.'"[21] The courts of appeals have identified certain exceptional circumstances in which it may be appropriate to exercise this discretion and deviate from this rule of practice. First, an appellate court will "consider an issue not raised in the district court if it involves a pure question of law, and if refusal to consider it would result in a miscarriage of

16. Simply because Congress empowers the Executive to forbid certain transfers of property and he acts thereon does not imply that the jurisdiction of the federal courts is dependent upon the issuance of a license by the Treasury Department. Indeed, in other situations in which congressionally approved Executive action has suspended legal proceedings over which federal courts would otherwise have jurisdiction, the action has *not* been characterized as depriving the court of jurisdiction. For example, in those situations in which Congress has empowered the President "to invoke the act of state doctrine in cases where national foreign policy interests so require ..., the Executive Branch [has] the power to determine finally, litigable questions in the foreign affairs field." *Banco Nacional de Cuba v. Farr*, 243 F.Supp. 957, 976 (S.D.N.Y.1965), *aff'd*, 383 F.2d 166 (2d Cir.1967). Invocation of the act of state doctrine, however, "does not oust the court of jurisdiction." 243 F.Supp. at 976. Similarly, "[n]o one would suggest that [the Executive's pre-Foreign Sovereign Immunity Act (28 U.S.C. §§ 1330, 1602 *et seq.*) practice of determining sovereign immunity on a case-by-case basis] divest[ed] the courts of 'jurisdiction.'" *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 2989, 69 L.Ed.2d 918 (1981). Nonetheless, one circuit court has determined that the license confers subject matter jurisdiction, *see Banco Nacional de Cuba, and Empresa Cubana Exportadora de Laimentos Y Productos Varios v. Turnbull*, 694 F.2d 722 unpublished op. at 2 (9th Cir.1982). On a related point, one district court has properly dismissed a complaint seeking an

order to transfer blocked property in the absence of a Treasury license authorizing such a transfer. *See Richardson v. Simon*, 420 F.Supp. 916 (E.D.N.Y.1976).

17. *See generally* note 16, *supra.* Note the language of the limited and belated license issued in this case, *supra*, page 9. It does not authorize a transfer to appellees of the funds on deposit in the district court.

18. *E.g., Rickard v. Auto Publishers, Inc.*, 735 F.2d 450 at 453 n. 1, (11th Cir.1984) (subject matter jurisdiction); *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307 (5th Cir.1976) (indispensable party).

19. *Troxler v. Owens-Illinois, Inc.*, 717 F.2d 530, 532–33 (11th Cir.1983); *Harris Corp. v. National Iranian Radio and Television*, 691 F.2d 1344, 1353 (11th Cir.1982).

20. *Franki Foundation Co. v. Alger-Rau & Assocs., Inc.*, 513 F.2d 581, 586 (3d Cir.1975); *Krause v. Sacramento Inn*, 479 F.2d 988, 989 (9th Cir. 1973).

21. *Roofing & Sheet Metal Serv. v. La Quinta Motors Inns*, 689 F.2d 982, 989 (11th Cir.1982) (quoting *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826, 837 (1976)). *See also Commodity Futures Trading Com'n v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 581 (9th Cir.1982); *Proctor v. State Farm Mut. Auto Ins. Co.*, 675 F.2d 308, 325–26 (D.C.Cir.),

justice."[22] Second, the rule may be relaxed where the appellant raises an objection to an order which he had no opportunity to raise at the district court level.[23] Third, the rule does not bar consideration by the appellate court in the first instance "where the interest of substantial justice is at stake."[24] Fourth, "a federal appellate court is justified in resolving an issue not passed on below ... where the proper resolution is beyond any doubt."[25] Finally, it may be appropriate to consider an issue first raised on appeal if that issue presents significant questions of general impact or of great public concern.[26]

■ The instant case meets the requirements of the "great public concern" exception. McDonald appeals from a summary judgment in which the district court ordered that two Cuban nationals have judgment in the amount of $1,334,250. Bearing in mind that a principal purpose of the Cuban Assets Control Regulations was to deny Cuba access to American dollars which could finance acts of aggression or subversion,[27] this issue is of great public concern. If we were to decline to reach the effect of the Cuban parties having failed to comply with the Regulations prior to filing suit, a vacuum would be left with respect to whether a license is required to invoke federal court jurisdiction under facts such as we have here. Thus, we shall address appellant's claim even though he failed to raise it below.

### B.

Appellant claims that the district court's order that the Cuban parties have judgment against appellant effects a transaction or transfer of property proscribed by the Cuban Assets Control Regulations. Because the Cuban parties did not obtain authorization from the Treasury Department prior to filing suit against appellant, appellant argues that the proceedings were a nullity. Without expressing any opinion as to the validity of a retroactively issued license,[28] we find no merit in appellant's argument.

In the instant case, the Cuban parties asserted a cross-claim against appellant and obtained an *in personam* judgment for damages. The statute, the regulations and the cases which have examined the issue make clear that a Treasury Department authorization or license is not a prerequisite to initiating an *in personam* lawsuit. The Assets Control Regulations forbid only those judicial acts that transfer a property

---

cert. denied, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982).

22. *Roofing & Sheet Metal Serv., supra,* 689 F.2d at 990. *See also Fehlhaber v. Fehlhaber,* 681 F.2d 1015, 1030 (11th Cir.1982).

23. *In re Novack,* 639 F.2d 1274, 1277 (5th Cir. Unit B 1981) (citing Fed.R.Civ.P. 46).

24. *Id. Cf. Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941) ("Rules of practice and procedure ... do not require sacrifice of the rules of fundamental justice.").

25. *Singleton v. Wulff, supra,* 428 U.S. at 121, 96 S.Ct. at 2877. *See Washington Gas Light Co. v. Virginia Elec. & Power Co.,* 438 F.2d 248, 250–51 (4th Cir.1971).

26. *See Franki Foundation Co. v. Alger-Rau & Assocs., Inc., supra,* 513 F.2d at 586; *Brennan v. Gilles & Cotting, Inc.,* 504 F.2d 1255, 1266 (4th Cir.1974); *Krause v. Sacramento Inn, supra,* 479 F.2d at 989; *Green v. Brown,* 398 F.2d 1006, 1009 (2d Cir.1968); *Nuelsen v. Sorensen,* 293 F.2d 454 at 462 (9th Cir.1961).

27. *United States v. Frade,* 709 F.2d 1387, 1401–02 (11th Cir.1983). *See* Goodman, *United States Government Foreign Property Controls,* 52 Geo. L.J. 767, 792–93 (1964).

28. The Regulations state that "No license or other authorization contained in this part or otherwise issued by or under the direction of the Secretary of the Treasury ... shall be deemed to validate any transaction effected prior to the issuance thereof, *unless* such license or other authorization specifically so provides." 31 C.F.R. § 515.502(a) (1983) (emp. added). The license involved in this case specifically provided that it applied retroactively.

In an unpublished order, the Ninth Circuit has intimated that such licenses may be given retroactive effect and confer subject matter jurisdiction on the district court after the suit has been initiated. *Banco Nacional de Cuba, supra* note 16. That court, however, did not attempt to reconcile its decision with the established view in other contexts that the Executive's foreign policy determinations do not affect the courts' subject matter jurisdiction. *See* note 16, *supra.*

interest. Since an *in personam* lawsuit is merely an attempt to establish liability and fix damages so that one's interests will be protected until a license is secured or until the Regulations are suspended, the action does not focus on any particular property within the jurisdiction.

■ Although in this case Reynolds paid a fund into court in an interpleader action, the litigation between appellant and appellees was *in personam*. It was not until after judgment that a transfer of property became possible. Entry of judgment triggered the application of the Regulations because of the nationality of appellees, and all subsequent proceedings to enforce the judgment must therefore be licensed. In *Tagle v. Regan*, 643 F.2d 1058 (5th Cir. Unit B 1981), the government argued that *Propper v. Clark*, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949), prohibited a Florida trial court from entering an order that determined that three children of the deceased, one of whom was a citizen and resident of Cuba and therefore a designated national subject to the Cuban Assets Control Regulations, were entitled to one-third each of the decedent's estate. The government read certain language from *Propper* broadly to mean that, in the absence of a license, "any judicial transfer of assets is barred." While this legal conclusion urged by the government is correct, the court distinguished *Propper* on its facts, stating that

> [t]he language cited by the Treasury simply does not support their position. *Propper* forbids transfer of title to frozen assets without a license. The Florida court, however, did not transfer title, but simply determined claims under state law. As long as enforcement of these claims is conditioned upon obtaining a license, this procedure is not in conflict with *Propper*. (citations omitted).

643 F.2d at 1067. Other courts have taken the same approach in construing analogous regulations concerning Iran,[29] Vietnam,[30] and Germany and other access countries.[31] Thus, the conclusion seems clear that no license need be obtained from the Treasury before initiating an *in personam* suit which merely establishes liability and fixes damages.[32] While a license is not neces-

---

**29.** *E.g., American Int'l Group, Inc. v. Islamic Republic of Iran*, 657 F.2d 430, 443 n. 15 (D.C. Cir.1981); *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800, 809–14 (1st Cir.1981); *Marschalk Co. v. Iran National Airlines Corp.*, 518 F.Supp. 69, 79 (S.D.N.Y.1981); *Electronic Data Sys. Corp. v. Social Security Organization of Iran*, 508 F.Supp. 1350, 1361 (N.D. Tex.1981). Appellees also rely upon *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). Although the *Dames & Moore* Court's discussion of the President's authority to suspend claims involving Iranian assets pending in American courts might be, under ordinary circumstances, a persuasive analogy to the need for Executive authorization to initiate an *in personam* lawsuit, *see* 453 U.S. at 675, 101 S.Ct. at 2984, we are reluctant to extend the Supreme Court's opinion that far. The Court expressly stated that "[w]e attempt to lay down no general 'guidelines' covering other situations not involved here, and attempt to confine the opinion only to the very questions necessary to decision of the case." 453 U.S. at 661, 101 S.Ct. at 2977.

**30.** *E.g., Vishipco Line v. Chase Manhattan Bank*, No. 77 Civ. 1251 (S.D.N.Y., Nov. 3, 1978).

**31.** *E.g., Zittman v. McGrath*, 341 U.S. 446, 71 S.Ct. 832, 95 L.Ed. 1096 (1951); *Brown v. Hugo Stinnes Corp.*, 306 N.Y. 789, 118 N.E.2d 603 (1954), *aff'g*, 282 App.Div. 186, 121 N.Y.S.2d 905 (App.Div. 1st Dept.1953); *Singer v. Yokohama Specie Bank*, 299 N.Y. 113, 85 N.E.2d 894 (1949); *Metallo-Chemical Corp. v. Banque Transatlantique Societe Anonyme*, 188 Misc. 596, 67 N.Y. S.2d 186 (1946).

**32.** Some cases which have held that *in personam* lawsuits do not effect a transfer of property within the meaning of applicable Assets Control Regulations have drawn a distinction between *in personam* suits on the one hand, and *in rem* and *quasi in rem* actions on the other. *See, e.g., American Int'l Group, supra*, 657 F.2d at 443 n. 15 ("A claim asserted *in personam*, rather than *in rem* or *quasi in rem*, has simply no necessary relation to any of the defendants' property located in the jurisdiction."). Had judgment for appellees been awarded from the fund held by the district court pursuant to the interpleader action brought by Reynolds, this case might have presented a more difficult question. Courts are not in complete agreement over the nature of an interpleader action. Some have indicated that interpleader is an *in rem* or *quasi in rem* proceeding, *see, e.g., General Atomic Co. v. Duke Power Co.*, 553 F.2d 53, 57 (10th Cir.1977) ("The action is an *in rem* or *quasi in rem* suit in its nature."); *Equifax, Inc. v. A.D. Luster*, 463

sary to litigate, a district court should not enter judgment in a form that would permit a foreign national plaintiff to levy upon property or collect funds when that plaintiff is prohibited from transferring assets out of this country by TWEA. It is at that point that plaintiff must secure a license.

### III.

Appellant's contentions have no merit, and the judgment of the district court accordingly is

AFFIRMED.

F.Supp. 352, 363 (E.D.Ark.1978) ("This suit has some of the attributes of an *in rem* proceedings."), while others have characterized interpleader as *in personam. See, e.g., Humble Oil & Refining Co. v. Copeland,* 398 F.2d 364, 368 (4th Cir.1968) ("Interpleader is based upon *in person-am* jurisdiction ..."); *Knoll v. Socony Mobil Oil Co.,* 369 F.2d 425, 429 (10th Cir.1966). We need not concern ourselves with this question because the interpleaded fund was not the basis for the *in personam* damage award.