934 F.2d 1506
 60 USLW 2061
 Stan BAUMANN, Plaintiff-Appellee, Cross-Appellant,
v.
SAVERS FEDERAL SAVINGS & LOAN ASSOC. and Resolution Trust
Corporation, as conservator of Savers Federal
Savings and Loan Association,
Defendants-Appellants, Cross-Appellees.
 No. 89-5208.
 United States Court of Appeals,
Eleventh Circuit.
 July 9, 1991.
 
 Jose I. Astigarraga, Steel Hector & Davis, Thomas R. Julin, Alicia R. Zalesin, Emily Wheeler, Miami, Fla., for defendants-appellants, cross-appellees.
 Jesse Diner, Atkinson, Jenne, Diner, Stone & Cohen, Hollywood, Fla., Edward A. Perse, Miami, Fla., for plaintiff-appellee, cross-appellant.
 Appeals from the United States District Court for the Southern District of Florida.
 Before KRAVITCH and BIRCH, Circuit Judges, and DYER, Senior Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 In D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court first held that the Federal Deposit Insurance Corporation ("FDIC") is not bound by agreements between borrowers and financial institutions that are not expressed in the written agreements between the parties. In this case of first impression in this circuit, we must decide whether the Resolution Trust Corporation ("RTC") can raise the D'Oench doctrine for the first time on appeal. Because we hold that it can, we reverse and remand for a new trial.
 
 
 2
 * In the early 1980s, Stan Baumann, a real estate developer, built an apartment complex in Gainesville, Florida. Baumann obtained loans for the project from Savers Federal Savings & Loan Association ("Savers Federal"). In 1984, Baumann decided to build a new project, and again contacted Savers Federal for financing. The new project (known as "Concept I") was to be a retail shopping center in Plantation, Florida. Concept I was to be anchored by a Winn-Dixie supermarket and later was to include a two-story office building.
 
 
 3
 Savers Federal initially loaned Baumann $7,500,000 for Concept I and received a mortgage and security interest. Baumann also gave Savers Federal a promissory note for the above amount, plus interest, costs, expenses, and disbursements. Baumann and his wife guaranteed the note. Finally, Baumann agreed to pay reasonable attorneys fees and other costs and expenses incurred in enforcing the guaranty.
 
 
 4
 Before construction began on Concept I, the City of Plantation Planning Board refused to approve Concept I and recommended that the proposed site for the project be rezoned to prevent certain commercial uses, including the Winn-Dixie store. Baumann filed suit against the City of Plantation. He later abandoned the suit, however, and sought a compromise plan with the city.
 
 
 5
 In 1985, Baumann proposed Concept II, which he expected to receive approval from the city. Concept II envisioned a larger development, but with fewer retail units and more professional buildings. Concept II required more money, and Savers Federal agreed to increase the loan total to $9,750,000. Baumann therefore signed a second promissory note for the additional amount of $2,250,000. Baumann and his wife again guaranteed the loan. The revised loan allowed Baumann to build two buildings, but conditioned further advances on Baumann's pre-selling additional units. Once part of Concept II was completed, Savers Federal would then release its lien on real property for an established price.
 
 
 6
 By late 1986, after Savers Federal had advanced more than $8,000,000 of the loan amount, construction of Concept II had come to a halt. Baumann was in default on the loan and could not pay contractors. In December 1986, Baumann filed suit against Savers Federal, claiming that the failure of the project was due to Savers Federal's breach of the loan agreements and failure to cooperate with Baumann.
 
 II
 
 7
 Baumann's suit originally was filed in Florida circuit court. Baumann's theories of recovery were breach of the loan agreement, breach of Savers Federal's statutory duty of good faith, tortious interference, conversion, conspiracy, civil theft, and fraud. Savers Federal counterclaimed, seeking to foreclose on the mortgage and to collect on the promissory note. Baumann's wife also was joined in the litigation, and Savers Federal sought to collect on the personal guaranty of Baumann and his wife for the principal of the loan, interest, and collection costs. The Baumanns defended on the ground that Savers Federal had impaired the collateral.
 
 
 8
 At trial, Baumann contended that the loan was to be a "100% financed loan," meaning that Baumann would not have to contribute any of his own money. Baumann alleged that Savers Federal had explained that Baumann was a preferred customer and that Savers Federal would be his partner in the project and would do everything possible to ensure the timely and efficient completion of the project. Baumann also claimed that it was Savers Federal's lack of cooperation in adjusting Baumann's interest payments that prevented him from pursuing his suit against the City of Plantation. Baumann further asserted that Savers Federal continually delayed advancing funds to Baumann, resulting in work stoppages and liens being placed on the property. Savers Federal, on the other hand, claimed that it had done everything required of it under the loan documents, and that any delays in the project were due to other factors, not the fault of Savers Federal. Savers Federal also argued that Baumann had not proved any damages.
 
 
 9
 On December 1, 1988, the jury returned a verdict. It found that Savers Federal had breached its loan agreements with Baumann and its statutory duty of good faith. The jury also found that Savers Federal had impaired Baumann's collateral. The jury awarded $15,400,000 for the breach of contract and breach of good faith, and $8,740,000 for the impairment of collateral. On December 29, 1989, the court decided Savers Federal's counterclaim, which had not been submitted to the jury. The court held that Savers Federal could foreclose on its mortgage, and therefore was entitled to $8,034,797.10. The court did not allow costs and fees, however, based on its finding that Savers Federal had unclean hands. On January 25, 1989, the court entered a final judgment, awarding Baumann $15,400,000 and Savers Federal $8,034,797.10, for a net judgment of $7,365,202.90 in favor of Baumann. In making this calculation, the court ignored the jury's award to Baumann of $8,740,000 for the impairment of collateral.
 
 
 10
 On February 10, 1989, Savers Federal was declared insolvent by the Federal Home Loan Bank Board, which appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") conservator of Savers Federal. By virtue of its status as conservator, FSLIC became a party to this litigation. On February 13, 1989, pursuant to 12 U.S.C.A. Sec. 1730(k)(1)(C),[1] FSLIC removed the case from the Florida court to federal district court. FSLIC and Savers Federal then filed a notice of appeal in this court from the final judgment rendered on January 25, 1989. On March 10, 1989, Baumann filed a notice of cross-appeal. Also on March 10, the district court remanded the case to state court. On April 24, however, this court granted FSLIC and Savers Federal's petition for writ of mandamus, allowing the case to remain in federal court and treating the proceedings in the state court as if they had occurred in the federal district court. In re Savers Federal Sav. & Loan Ass'n, 872 F.2d 963 (11th Cir.1989).
 
 
 11
 On August 9, 1989, President Bush signed into law the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101-73, 103 Stat. 183 (1989). Under section 501(a) of FIRREA, 103 Stat. at 370, the Resolution Trust Corporation ("RTC") was substituted for FSLIC in situations, such as this case, where FSLIC was acting as conservator of a financial institution. On October 4, 1989, the Office of Thrift Supervision ("OTS") directed that a purchase and assumption transaction take place. First, Savers Federal was transferred from conservatorship to receivership. Also, OTS chartered another institution, Savers Savings Association ("Savers Savings"). Savers Savings then purchased all assets of Savers Federal, including Savers Federal's claims against Baumann. Liabilities of Savers Federal, including Baumann's claim against Savers Federal, were retained by RTC as receiver of Savers Federal. Simultaneously, OTS declared Savers Savings insolvent and appointed RTC as conservator.
 
 
 12
 After various administrative proceedings took place pursuant to the purchase and assumption agreement, RTC, as receiver of Savers Federal, disallowed Baumann's claim on May 29, 1990, stating that the claim should not be upheld on appeal. Baumann then elected to forego further administrative proceedings and allow the present appeal to determine the outcome of his case.
 
 III
 
 13
 The first issue we must address is whether the doctrine of D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), applies in this case. In D'Oench, a bank and its customer engaged in a scheme whereby the customer provided a demand note to the bank, which the bank reflected on its books; the bank promised, however, that it would not actually collect on the note, a factor the bank did not reflect on its books. The FDIC later became the successor in interest to the bank and attempted to collect on the note. The customer argued that the parties had an agreement that the bank would not collect on the note. In rejecting the customer's defense, the Supreme Court stated that "federal policy ... protect[s] [FDIC] and the public funds it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [FDIC] insures or to which it makes loans." Id. at 457, 62 S.Ct. at 679. The Court therefore held that because the agreement not to collect on the note was not recorded in the bank's records, the customer was barred from enforcing the agreement against FDIC. As we discuss in Part IV, the rationale behind D'Oench has been extended far beyond the factual setting in D'Oench itself, and now applies to virtually all cases where a federal depository institution regulatory agency is confronted with an agreement not documented in the institution's records.
 
 
 14
 Because RTC did not enter this case until after final judgment had been entered in the trial court, the trial court did not have an opportunity to decide the D'Oench issue. RTC asserts that it is entitled to raise the issue for the first time on appeal. In general, this court will not address an argument unless it has been raised in the district court. Federal Deposit Ins. Corp. v. 232, Inc., 920 F.2d 815, 817 (11th Cir.1991); Caban-Wheeler v. Elsea, 904 F.2d 1549, 1557 (11th Cir.1990); Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 360 (11th Cir.1984). Although we reject RTC's argument that FIRREA creates a statutory right in RTC to raise D'Oench for the first time on appeal, we nonetheless hold that the case falls within an exception to the general rule, and therefore allow RTC to raise its argument for the first time in this court.
 
 
 15
 * RTC argues that FIRREA specifically requires us to address the D'Oench issue for the first time on appeal. Section 212(a) of FIRREA, 103 Stat. at 232 (codified at 12 U.S.C.A. Sec. 1821(d)), is entitled "Conservatorship and Receivership Powers of the Corporation,"[2] and provides the following:
 
 
 16
 (13) Additional rights and duties
 
 
 17
 (A) Prior final adjudication
 
 
 18
 The Corporation shall abide by any final unappealable judgment of any court of competent jurisdiction which was rendered before the appointment of the Corporation as conservator or receiver.
 
 
 19
 (B) Rights and remedies of conservator or receiver
 
 
 20
 In the event of any appealable judgment, the Corporation as conservator or receiver shall--
 
 
 21
 (i) have all the rights and remedies available to the insured depository institution (before the appointment of such conservator or receiver) and the Corporation in its corporate capacity, including removal to Federal court and all appellate rights; and
 
 
 22
 (ii) not be required to post any bond in order to pursue such remedies.
 
 
 23
 According to RTC, RTC entered this litigation when it was at the appealable judgment phase, thus paragraph (B) above allows it to assert all of its "rights and remedies" at this stage of the proceedings.
 
 
 24
 Only one circuit court decision has confronted this issue. In Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n, 885 F.2d 266 (5th Cir.1989), FSLIC, acting as conservator, entered the litigation after final judgment in the district court and argued that section 212(a) of FIRREA allowed it to raise D'Oench for the first time on appeal. The Fifth Circuit disagreed, stating that the statute simply "means that conservators and receivers are given standing to pursue all appeals, where before its enactment only FDIC acting in its corporate capacity could pursue certain claims. This section gives FSLIC no new substantive rights in this appeal." Id. at 275.
 
 
 25
 Relying on recent Texas state court decisions that have disagreed with Olney, see Federal Sav. and Loan Ins. Corp. v. T.F. Stone-Liberty Land Assoc., 787 S.W.2d 475 (Tex.Ct.App.), writ granted, 34 Tex.Sup.Ct.J. 90 (1990); FDIC/Manager Fund v. Larsen, 793 S.W.2d 37 (Tex.Ct.App.1990), RTC claims that FIRREA intended to grant more than just "standing" to RTC in this situation. According to RTC, if Congress had intended the provision to do no more than confer standing, it would not have used the phrase "all the rights and remedies available to ... the Corporation in its corporate capacity." See 12 U.S.C.A. Sec. 1821(d)(13)(B)(i) (emphasis added).
 
 
 26
 We agree with the Olney court that the statute does not give RTC in its capacity as conservator or receiver new substantive rights. RTC's reading of the statute would not only give RTC as conservator or receiver "all the rights and remedies" of RTC "in its corporate capacity," but would actually give RTC greater powers as conservator or receiver than it has in its corporate capacity. This is because neither FIRREA nor prior existing statutes grant RTC in its corporate capacity the power to raise arguments for the first time on appeal. Section 1821, which applies only to RTC acting as conservator or receiver, therefore, cannot grant this right merely by granting all the rights and remedies of RTC in its corporate capacity.
 
 
 27
 The flaw in RTC's argument is easily exposed by examining another Fifth Circuit case. In Thurman v. Federal Deposit Ins. Corp., 889 F.2d 1441 (5th Cir.1989), FSLIC, acting in its corporate capacity, was assigned certain assets pursuant to a purchase and assumption transaction. This assignment occurred after a final judgment concerning the assets had been rendered in the trial court. FSLIC-corporate then intervened in the case and attempted to raise D'Oench for the first time on appeal.
 
 
 28
 In one portion of the opinion, the Thurman court addressed the recent enactment of FIRREA. See Thurman, 889 F.2d at 1444. In declining to address D'Oench for the first time on appeal, however, the court did not consider section 1821, the provision at issue in this case. This was not due to an oversight by the court or the parties; the issue was not raised for the simple reason that FSLIC was not entitled to raise it. Section 1821(d) is entitled "Powers and duties of Corporation as conservator or receiver." In Thurman, FSLIC was acting in its corporate capacity, not in its capacity as conservator or receiver, and thus was unable to avail itself of section 1821.
 
 
 29
 Having examined the circumstances of Thurman, it now can be seen that RTC's argument in this case falls of its own weight. RTC claims that section 1821(d)(13)(B) was intended to give RTC "all the rights and remedies" of RTC acting in its corporate capacity, including its right to argue D'Oench. Yet the right at issue in this case is not the right of RTC to argue D'Oench, which is unquestioned, but rather the right of RTC to raise an argument for the first time on appeal. If RTC were acting in its corporate capacity, as it was in Thurman, it would have no statutory basis to claim that it was entitled to raise issues for the first time on appeal. To allow RTC acting as a conservator or receiver to do so based on the "all the rights and remedies" language of section 1821(d)(13)(B) would be to grant more power than would be available to RTC in its corporate capacity. Yet the statute specifically grants only those rights and remedies available to the RTC "in its corporate capacity." Thus, any right of RTC to raise D'Oench for the first time on appeal does not come from section 1821.
 
 B
 
 30
 Although section 1821(d)(13) does not confer upon the RTC in its conservator or receiver status a statutory right to raise issues for the first time on appeal, we must determine whether our cases nevertheless allow it to do so. As discussed above, this court generally will not address an issue that has not been decided by the trial court. Application of this rule, however, is in the discretion of the appellate court, see Federal Deposit Ins. Corp. v. 232, Inc., 920 F.2d 815, 817 (11th Cir.1991), and there are situations where it is appropriate for us to entertain an argument not raised below. In Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355 (11th Cir.1984), this court described five such situations:
 
 
 31
 First, an appellate court will 'consider an issue not raised in the district court if it involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice.' Second, the rule may be relaxed where the appellant raises an objection to an order which he had no opportunity to raise at the district court level. Third, the rule does not bar consideration by the appellate court in the first instance 'where the interest of substantial justice is at stake.' Fourth, 'a federal appellate court is justified in resolving an issue not passed on below ... where the proper resolution is beyond any doubt.' Finally, it may be appropriate to consider an issue first raised on appeal if that issue presents significant questions of general impact or of great public concern.
 
 
 32
 Id. at 360-61 (citations omitted); see also In re Daikin Miami Overseas, Inc., 868 F.2d 1201, 1206-07 (11th Cir.1989) (addressing the five considerations).
 
 
 33
 We conclude that this case falls within the second exception above. Although the D'Oench argument was not raised in the trial court, we will address it here because RTC had no opportunity to raise it at the appropriate time. This is consistent with the purposes behind the general rule. Under normal circumstances, allowing a party to raise an argument or objection for the first time on appeal creates an incentive for parties to litigate a case while keeping certain issues in reserve, hoping to later overturn an unfavorable result. Cf. United States v. Sutherland, 428 F.2d 1152, 1158 (1970) ("Having tried and appealed its case on one theory, an unsuccessful party may not then use a petition for rehearing as a device to test a new theory."). We often have stressed that a party had an opportunity to raise an issue in the trial court but failed to do so. See, e.g., Formby v. Farmers and Merchants Bank, 904 F.2d 627, 634 (11th Cir.1990); United States v. Richards, 646 F.2d 962, 963 (5th Cir. June 1981),[3] cert. denied, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981); Delesdernier v. Porterie, 666 F.2d 116, 125 (5th Cir.), cert. denied, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982). Here, we need not be concerned with the possibility of strategically reserving, or simply carelessly litigating, certain issues because RTC was not a party to the suit at the trial level. Now that RTC is a proper party to the suit, it should not be penalized for not raising a defense it had no opportunity to present.
 
 
 34
 Our determination also does no damage to other concerns such as finality or fairness to the parties. There is no question that had Savers Federal been declared insolvent and RTC appointed conservator just a few days earlier, RTC would have been entitled to raise D'Oench. In fact, this court has addressed arguments made by federal banking regulators that were raised for the first time on a motion for reconsideration in the trial court. See Federal Deposit Ins. Corp. v. McCullough, 911 F.2d 593, 598 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). Here, if RTC had raised its argument on a motion for reconsideration, the district court would have had to engage in the same analysis that we will undertake. If D'Oench changes the outcome of the case, that result would have occurred if RTC had entered the litigation earlier. Thus, examination of a valid substantive issue hardly seems unfair. Indeed, it would be unfair to prevent RTC from raising a legitimate argument at the earliest time it was able to do so.
 
 
 35
 Baumann argues, however, that application of D'Oench in these circumstances is inappropriate because the purposes of the doctrine are not served by application at this late stage of the proceedings. According to Baumann, the purpose of the D'Oench doctrine is to ensure that bank examiners are not misled by secret agreements that prevent examiners from determining the true value of a bank's assets. Here, the validity of the agreements had been fully litigated before the RTC was appointed conservator of Savers Federal; thus, Baumann contends that RTC cannot claim that it was unaware of the so-called oral side agreements in this case.
 
 
 36
 Although, as Baumann correctly points out, the purpose of the D'Oench doctrine is to prevent banks and their customers from hiding the true value of a financial institution's assets from government regulators, Baumann's argument misunderstands the nature of the harm following such deception. In Langley v. Federal Deposit Ins. Corp., 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), a unanimous Supreme Court addressed a bank customer's argument that FDIC could not rely on 12 U.S.C.A. Sec. 1823(e), the statutory codification of D'Oench, where FDIC knew of alleged misrepresentations before it acquired the note at issue in the case. The Court stated:
 
 
 37
 Harm to the FDIC (and those who rely upon the solvency of its fund) is not avoided by knowledge at the time of acquiring the note. The FDIC is an insurer of the bank, and is liable for the depositors' insured losses whether or not it decides to acquire the note. The harm to the FDIC caused by the failure to record occurs no later than the time at which it conducts its first bank examination that is unable to detect the unrecorded agreement and to prompt the invocation of available measures, including termination of the bank's deposit insurance.
 
 
 38
 Id. at 95, 108 S.Ct. at 403 (citations omitted). Therefore, according to the Court, when addressing the requirements of section 1823(e), "[a]n agreement that meets them prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew." Id. at 95, 108 S.Ct. at 403. See also Victor Hotel Corp. v. FCA Mortgage Corp., 928 F.2d 1077, 1082 (11th Cir.1991) (knowledge of a bank's misrepresentation at time FDIC acquires asset irrelevant for purposes of analyzing section 1823(e)); Federal Sav. & Loan Ins. Corp. v. Two Rivers Assoc., Inc., 880 F.2d 1267, 1275 n. 12 (11th Cir.1989) (D'Oench applies regardless of FSLIC's knowledge at time it acquires asset).
 
 
 39
 We also note that our determination that RTC may raise D'Oench for the first time on appeal when it did not have the opportunity to raise it below is not inconsistent with other circuit court opinions that have refused to allow banking authorities to do so. In Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n, 885 F.2d 266 (5th Cir.1989), in addition to rejecting FSLIC's statutory argument, see supra, Part III(A), the court further held that it would not make an exception to the common law rule of not addressing arguments for the first time on appeal. In that case, the district court determined that certain participation agreements were void and therefore rescinded the agreements. On appeal, the court held that FSLIC could not raise D'Oench and other unique federal defenses because FSLIC had never acquired a "right, title or interest" in the agreements. Because the judgment of the district court rendered the agreements void, FSLIC never acquired an asset upon which to base its arguments. Id. at 274-75; see also Grubb v. Federal Deposit Ins. Corp., 868 F.2d 1151, 1158-59 (10th Cir.1989) (certain notes were voided by the district court's judgment, thus preventing FDIC from acquiring any "right, title or interest" in the notes upon which to base its D'Oench argument); Thurman v. Federal Deposit Ins. Corp., 889 F.2d 1441, 1447 (5th Cir.1989) (relying on Grubb and further noting that upsetting the judgment of the trial court was unnecessary because "the newly proffered defense would not have changed the outcome of the case as it was tried...."). In this case, there is no contention that the trial court's judgment rendered the loan agreements void. Rather, the judgment required Savers Federal to pay damages based on the breach of valid agreements. The judgment also awarded Savers Federal the right to collect the principal of the loan, subject to Baumann's award. Because there is a valid interest remaining in RTC, it may attempt to protect that interest. Our conclusion is consistent with another panel opinion of the Fifth Circuit, which stated, without referring to either Olney or Thurman, that "[a]s the FDIC had neither opportunity nor occasion to assert the D'Oench doctrine in the trial court, we will entertain its assertion here." Union Federal Bank of Indianapolis v. Minyard, 919 F.2d 335, 336 (5th Cir.1990) (footnote omitted).
 
 
 40
 In sum, RTC had no opportunity to raise its D'Oench argument in the trial court. While we realize that allowing RTC to raise it here for the first time may result in overturning the outcome reached in the trial court, we are aware of Congress's recognition that "[t]he appointment of a conservator or receiver can often change the character of litigation...." H.R.Rep. No. 54, 101st Cong., 1st Sess. at 331 (1989), reprinted in 1989 U.S.Code Cong. & Admin.News 86, 127. We too recognize that change, and therefore hold that RTC is entitled to raise an argument at the first stage of the proceedings at which it is able to do so.
 
 IV
 
 41
 We now determine the effect that D'Oench has on this case. As discussed above, the Court in D'Oench held that in litigation between a bank customer and the FDIC, as successor in interest to a bank, the customer may not rely on agreements outside the documents contained in the bank's records to defeat a claim of the FDIC. D'Oench, 315 U.S. at 459, 62 S.Ct. at 680. This rule ensures that banks and their customers will include the entire extent of their obligations in the bank's records, thus allowing bank examiners to assess accurately the financial condition of the bank. Id. This rule was later codified by the Federal Deposit Insurance Act of 1950, Sec. 2(e), 64 Stat. 889, as amended, 12 U.S.C.A. Sec. 1823(e), as follows:
 
 
 42
 No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement--
 
 
 43
 (1) shall be in writing,
 
 
 44
 (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
 
 
 45
 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
 
 
 46
 (4) has been, continuously, from the time of its execution, an official record of the depository institution.
 
 
 47
 Since the passage of FIRREA, this provision also applies to the RTC. See 12 U.S.C.A. Sec. 1441a(b)(4). Before passage of FIRREA, courts had determined that the purposes of D'Oench and section 1823(e) were the same, and therefore had applied the same analysis regardless of whether the party involved in the case was the FDIC or another federal banking regulator. See Twin Const., Inc. v. Boca Raton, Inc., 925 F.2d 378, 382 & n. 2 (11th Cir.1991); Vernon v. Resolution Trust Corp., 907 F.2d 1101, 1105 (11th Cir.1990). We therefore consider cases interpreting D'Oench or section 1823(e) as precedent.
 
 
 48
 Since the Court's decision in D'Oench, the doctrine has expanded greatly. In Langley v. Federal Deposit Ins. Corp., 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Supreme Court held that even if a bank fraudulently induces a customer into signing a note, section 1823(e) bars the customer from relying on the bank's misrepresentations as a defense to payment of the note. Id. at 92-93, 108 S.Ct. at 401-02. Subsequent cases have made clear that the D'Oench doctrine applies even where the customer is completely innocent of any bad faith, recklessness, or negligence. See Federal Sav. & Loan Ins. Corp. v. Gordy, 928 F.2d 1558, 1566 (11th Cir.1991).
 
 
 49
 As a result of the frequent failures of financial institutions in recent years, the federal courts have had several opportunities to address the D'Oench issue. A number of opinions have traced the history of D'Oench, section 1823(e), and the cases that have interpreted them, and have discussed the policies behind the doctrine and various situations in which the doctrine applies. See, e.g., Gordy, 928 F.2d 1558, 1561-64; Twin Const., 925 F.2d at 381-83; McCullough, 911 F.2d at 599-601; Vernon, 907 F.2d at 1104-08; Bell & Murphy and Assoc., Inc. v. Interfirst Bank Gateway, N.A., 894 F.2d 750, 752-54 (5th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); Beighley v. Federal Deposit Ins. Corp., 868 F.2d 776, 782-84 (5th Cir.1989); Federal Deposit Ins. Corp. v. Newhart, 892 F.2d 47, 49-50 (8th Cir.1989). We need not reiterate the reasoning in this growing list of opinions that outline all the subtleties of the doctrine. Rather, we simply state the rule that has emanated from these cases: In a suit over the enforcement of an agreement originally executed between an insured depository institution and a private party, a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records. McCullough, 911 F.2d at 600.
 
 
 50
 The sweep of the doctrine is so broad that a recent panel of this court noted thatafter extensive research, this Court has unearthed only three types of situations where an assertion of D'Oench failed to bar the defense raised by the debtor to resist enforcement of the debt instrument: when the borrower is completely innocent of any intentional or negligent deception in her defense against her debt; when the defense is manifest on the face of the obligation the insurer seeks to enforce; and when the borrower is a nonnegligent victim of fraud in the factum.
 
 
 51
 Vernon, 907 F.2d at 1101 n. 2. As for the first of these three situations, the panel cited Federal Deposit Ins. Corp. v. Meo, 505 F.2d 790 (9th Cir.1974). In light of our recent decisions on this issue, see, e.g., Gordy, 928 F.2d at 1566-67, it is clear that this exception is no longer tenable because lack of bad faith, recklessness, or even negligence is not a defense in D'Oench cases. The second situation occurred in Howell v. Continental Credit Corp., 655 F.2d 743 (7th Cir.1981). In that case, the Seventh Circuit noted that the document at issue clearly evidenced the obligation which the private party sought to enforce. Thus, bank examiners could not have been deceived. Finally, in Langley, 484 U.S. at 93, 108 S.Ct. at 402, the Court noted in dictum that while fraudulent inducement did not defeat enforcement by the FDIC, fraud in the factum might do so. Fraud in the factum renders an instrument entirely void, thus leaving the FDIC no interest in its enforcement. See also Federal Deposit Ins. Corp. v. Turner, 869 F.2d 270, 276 (6th Cir.1989); but see McLemore v. Landry, 898 F.2d 996, 1002 (5th Cir.1990) (declining to read fraud in the factum exception into Langley) (citing Templin v. Weisgram, 867 F.2d 240, 242 (5th Cir.1989)), cert. denied, --- U.S. ----, 111 S.Ct. 428, 112 L.Ed.2d 412 (1990).
 
 
 52
 In this case, significant portions of the testimony at trial focused on oral understandings not recorded in the loan documents. For example, Baumann testified at several points in the trial that the loan at issue was a "100% financed loan," and therefore Baumann would not need to use any of his own money to finance the project. This became significant when Concept I encountered problems with the City of Plantation Planning Board. According to Baumann, he could have maintained his suit against the city if Savers Federal would have suspended the running of interest or deducted the interest monthly from the interest reserve. Because Savers Federal did not do so, Baumann claimed he could not afford to pay both interest to Savers Federal and attorney's fees in his suit against the city. Nothing in the loan documents, however, required Savers Federal to either fund Baumann's litigation or alter the interest payment schedule. Although the documents gave Savers Federal the option to deduct from the interest reserve, it was not a requirement.
 
 
 53
 Baumann also testified that Savers Federal was required to go beyond its obligations in the loan documents because Savers Federal officials had told Baumann that Savers Federal would be his partner in the project. The loan documents specifically provided, however, that it was not the intention of the parties to be partners and that "the relationship of the parties shall be and remain that of debtor and creditor." Confronted with this provision of the agreement, Baumann testified that this was simply a "boilerplate" clause. Baumann's son, who assisted his father in negotiating the loan, also stated that he believed that he was in a partnership with Savers Federal. When asked whether the "no partnership" provision of the documents controlled, he stated: "Not when someone represents to me what their relationship is going to be with me, sir. That is what [a Savers Federal official] did."
 
 
 54
 The testimony above is prohibited by the D'Oench doctrine. The oral assurances allegedly provided to Baumann by Savers Federal officials go beyond the scope of the written loan documents. In reviewing Savers Federal's records, federal examiners would not have been put on notice that Savers Federal did not have the option described in the loan documents, but rather a contractual duty, to alter the interest scheme provided in the documents when Baumann ran into trouble with the city planning board. Examiners could not have expected that despite the contractual language stating that the parties would maintain a debtor-creditor relationship, Savers Federal had in fact agreed to assume the duties normally associated with a partnership relationship. Such information may have been critical to examiners in reviewing what Baumann conceded was a "high-risk" loan.
 
 
 55
 Although this result may seem unfair to Baumann, he had the opportunity to include the entire agreement in writing. By not doing so, he "lent himself to a scheme or arrangement whereby the banking authority ... was or was likely to be misled." D'Oench, 315 U.S. at 461, 62 S.Ct. at 681. That Baumann may have had no intention of misleading regulators is of no moment. As between private parties and federal deposit insurance agencies, both Congress and the Supreme Court have placed the burden on private parties to document fully the contours of their obligations from the inception of the transaction.
 
 
 56
 Baumann further argues, however, that even if D'Oench precludes evidence of oral agreements outside the written documents, the jury's verdict indicates that it was based solely on the written documents. According to Baumann, he never argued that Savers Federal breached any oral side agreements, but rather argued simple breach of contract and breach of good faith. The jury found in his favor on these issues. The jury rejected his claims for fraud and other "oral" theories of recovery. Thus, Baumann contends that the jury must have based its verdict on the written documents themselves. We disagree. First, we note that the elements of the claims upon which Baumann prevailed and the claims upon which he did not are sufficiently different that we cannot speculate as to the rationale behind the jury's conclusions. Second, nothing in the jury instructions indicates that the jury was informed that it could not consider evidence indicating an understanding of the parties contrary to that expressed in the loan documents. In light of the repeated testimony that Savers Federal "agreed" or was "obligated" to perform significantly beyond the obligations specified in the documents and to act as Baumann's partner, we find it unlikely that the jury relied solely on the written documents in making its determinations on the contract claims.
 
 
 57
 Finally, we note that although the above analysis warrants reversal of the outcome reached in the trial court, we cannot ultimately resolve the case at this stage of the proceedings. We reach this conclusion based on our determination that a jury could still find in favor of Baumann in this case. As discussed above, much of the testimony at trial concerned obligations outside the scope of the written documents. Other evidence at trial, however, focused on whether Savers Federal had breached the terms of the written documents, or had failed to perform them in good faith. As the Seventh Circuit pointed out in Howell v. Continental Credit Corp., 655 F.2d 743 (7th Cir.1981), the D'Oench doctrine does not protect federal agencies where bilateral obligations are evident on the face of the documents at issue. Id. at 746-47. Application of D'Oench in such circumstances would not further the purposes of the doctrine. Bank examiners cannot be misled by documents that evidence the true obligations of the parties. Although appropriate documentation cannot inform examiners of whether or not an institution will breach its agreements, such documentation does inform examiners of the extent of the institution's obligations, and therefore puts examiners on notice of the riskiness of an obligation and the amount of potential liability should the agreement be breached. Examiners are fully aware that any agreement could be breached, and the likelihood of this occurring must be taken into account in an evaluation of an institution's assets and liabilities. Thus, the protections provided to the deposit insurance fund by the D'Oench doctrine would not be furthered by allowing financial institutions to breach valid agreements or to carry them out in bad faith.
 
 
 58
 Here, Baumann claimed that Savers Federal failed to pay Baumann's draw requests in accordance with the schedule dictated in the loan documents. There are disputes in the testimony concerning when draw requests were received and when they were actually paid. There were also disputes concerning whether Savers Federal improperly failed to release its lien on part of the property in accordance with the loan documents. A jury conceivably could find that Savers Federal breached its obligations under the agreement or breached its duty to perform its obligations in good faith. So long as the jury's findings were not tainted by evidence of obligations not found in the loan documents, these findings could dictate a result in favor of Baumann. Because of the other evidence introduced at trial before RTC became a party to the case, however, we cannot know upon what facts the jury based its decision. Only a new trial, conducted in conformance with the D'Oench doctrine, can provide an answer.
 
 V
 
 59
 In accordance with the above discussion, the decision of the trial court is REVERSED and REMANDED for a new trial.[4]
 
 
 
 [1]
 This section was later repealed by section 407 of FIRREA. Section 501 of FIRREA granted RTC removal powers, which are now codified at 12 U.S.C.A. Sec. 1441a(l )
 
 
 [2]
 Although the "corporation" referred to in this section is FDIC, FIRREA grants these powers to RTC as well. See 12 U.S.C.A. Sec. 1441a(b)(4)
 
 
 [3]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981
 
 
 [4]
 Due to this result, we need not reach RTC's other arguments