OUTER BANKS CONTRACTORS, INC. v. DANIELS & DANIELS CONSTRUCTION, INC., OUTER BANKS FINANCIAL SERVICES, INC., MARK M. W. PARKER AND DANNY DANIELS

No. 921SC283

(Filed 7 September 1993)

1. Pleadings § 364 (NCI4th)— motion to amend complaint— denied—no abuse of discretion

The trial court did not abuse its discretion by denying plaintiff's motion to amend its complaint where the motion to amend was not filed until 20 August 1990, over a year

OUTER BANKS CONTRACTORS v. DANIELS & DANIELS CONSTRUCTION

[111 N.C. App. 725 (1993)]

after the original complaint, and the requested amendment purports to add a seventh cause of action but the cause of action is ambiguous and no relief is requested.

**Am Jur 2d, Pleading § 310.**

**Timeliness of amendments to pleadings made by leave of court under Federal Rule of Civil Procedure 15(a). 4 ALR Fed. 123.**

2. **Evidence and Witnesses § 1994 (NCI4th) — savings and loan — outside agreement — not admissible — D'Oench, Duhme doctrine**

The trial court did not err by granting a motion in limine by defendant Outer Banks Financial Services (OBFS) to prohibit introduction of alleged misrepresentations by Mark Parker where OBFS had contracted with Daniels & Daniels for the construction of a shopping center; Daniels & Daniels had subcontracted some of the work to plaintiff; payments from Daniels & Daniels to plaintiff were late; plaintiff contacted Mark Parker, a director and officer of OBFS, and received payment; plaintiff and Daniels & Daniels entered into a second contract after the initial work was completed; plaintiff was concerned about the late payments under the first contract and was told by Mark Parker that Parker would be monitoring the project and that plaintiff would be paid by OBFS if Daniels & Daniels failed to make payments; plaintiff completed the work but was not paid $266,232 due under the contract; plaintiff requested payment from OBFS; Great Atlantic Savings Bank, of which OBFS was a subsidiary, was declared insolvent and the Resolution Trust Corporation was eventually appointed Receiver; and plaintiff in the interim filed this action. The doctrine of *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, as codified at 12 U.S.C.A. § 1823(e), bars any outside agreement Mark Parker may have made with plaintiff.

**Am Jur 2d, Contracts §§ 396-398.**

Appeal by plaintiff from Judgment and Order of Dismissal entered 19 November 1991 by Judge Thomas S. Watts in Dare County Superior Court. Heard in the Court of Appeals 10 February 1993.

OUTER BANKS CONTRACTORS v. DANIELS & DANIELS CONSTRUCTION

[111 N.C. App. 725 (1993)]

*Pritchett, Cooke & Burch, by William W. Pritchett, Jr. and David J. Irvine, Jr., for the plaintiff-appellant.*

*Ward & Smith, P.A., by A. Charles Ellis, J. Michael Fields, and Ryal W. Tayloe, and Hughes, Hubbard & Reed, by Dennis S. Klein and Leslie R. Walls, for the defendant-appellee.*

WYNN, Judge.

The defendant, Outer Banks Financial Services [hereinafter OBFS] is a wholly-owned subsidiary of Great Atlantic Savings Bank [hereinafter GASB]. OBFS contracted with Daniels & Daniels Construction Co. [hereinafter Daniels & Daniels] to build a shopping center on land owned by OBFS in Avon, North Carolina. The shopping center contract was not reduced to writing.

Daniels & Daniels subsequently entered into a written subcontract agreement with the plaintiff construction company, Outer Banks Contractors [hereinafter OBC], for the grading, paving, curb and gutter construction on the project. Initially, the periodic payments called for by the contract were timely made to OBC, but later payments were between sixty and ninety days past due. When the payments from Daniels & Daniels were not made as scheduled, Mike Beacham, CEO of OBC, contacted Mark Parker, a director and officer of OBFS through March or April 1988, to inform him of the late payments. Subsequent to each of these conversations, OBC received payment.

Once the initial site work was completed, OBC and Daniels & Daniels entered into a second written subcontract, dated 29 June 1988, in which OBC agreed to do the paving, gutter and curb work for the shopping center. Because of the payment problems associated with the first contract, Mike Beacham insisted on meeting with Mark Parker and Danny Daniels, an officer and director of Daniels & Daniels, in June 1988, before OBC began work. At that meeting, Mark Parker told Mike Beacham that he would be monitoring the shopping center project and, if Daniels & Daniels failed to make the payments required under the contract, he would ensure that OBC was paid by OBFS. Mark Parker's assurances were not reduced to writing.

OBC apparently relied on the verbal representations of Mark Parker and commenced and completed the work required by the second contract between 15 August 1988 and 24 October 1988.

Daniels & Daniels, however, failed to pay the $266,232 due OBC pursuant to the contract. Thereafter, OBC requested payment from OBFS.

On 29 March 1989, GASB was declared insolvent by the Federal Home Loan Bank Board, which appointed the Federal Savings and Loan Insurance Corporation [hereinafter FSLIC] as Conservator for GASB. Subsequently, on 15 September 1989, the Resolution Trust Corporation [hereinafter RTC] was appointed Receiver for GASB, and the outstanding stock of OBFS became an asset of the RTC.

In the interim, on 30 June 1989, OBC filed a Complaint against OBFS, Mark Parker, Daniels & Daniels, and Danny Daniels alleging six causes of action: breach of contract; conversion; fraud; embezzlement; North Carolina RICO violations; and unfair and deceptive acts and practices. OBFS was the only defendant to file an Answer to the Complaint, and OBFS also filed a Crossclaim against the other defendants, which Crossclaim also went unanswered. The breach of contract claim was subsequently dismissed as against OBFS.

OBC filed a motion to amend its Complaint on 20 August 1990, which motion was denied. (Discussed in detail below). OBFS' subsequent 18 April 1991 motion for summary judgment was also denied and the case came on for trial 18 November 1991. Prior to trial, the trial court granted OBFS' motion in limine to exclude all evidence of the alleged oral misrepresentations of Mark Parker. OBC and OBFS waived a jury trial in open court. No other defendant was present in court during the proceedings.

After hearing evidence, Judge Watts entered a judgment against Daniels & Daniels, Danny Daniels, and Mark Parker. The amount of said judgment was subsequently trebled and OBC was also awarded costs and fees. OBC's case against OBFS was, however, dismissed with prejudice. From the trial court's denial of its motion to amend its complaint and from the trial court's granting of OBFS' motion in limine, OBC appeals to this Court.

I. Motion to Amend

[1]  The plaintiff first assigns error to the trial court's failure to grant its motion to amend its Complaint. In support of this contention, the plaintiff argues that the failure to allow the amend-

ment constitutes an abuse of discretion on the part of the trial court. We disagree.

The rules of civil procedure provide that a pleading may be amended after a responsive pleading has been filed "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." N.C. Gen. Stat. § 1A-1, Rule 15(a) (1990). A motion to amend a complaint is addressed to the sound discretion of the trial court and, as with any motion so addressed, the ruling " 'is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of reasoned decision.' " *House of Raeford Farms v. City of Raeford*, 104 N.C. App. 280, 282, 408 S.E.2d 885, 887 (1991) (quoting *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) ); *see also Caldwell's Well Drilling, Inc. v. Moore*, 79 N.C. App. 730, 731, 340 S.E.2d 518, 519 (1986). While the trial judge is not required to set forth specific reasons for denying a motion to amend a complaint, undue delay, bad faith, undue prejudice, futility of the amendment and repeated failure to cure defects by previous amendments have all been recognized as reasons justifying a denial of the motion. *House of Raeford Farms*, 104 N.C. App. at 282-83, 408 S.E.2d at 887.

In the present case, OBC filed its original Complaint on 30 June 1989, which Complaint was answered by OBFS on 20 February 1990. The motion to amend was not filed until 20 August 1990, over a year after the original Complaint. Moreover, the requested amendment purports to add a seventh cause of action, but the cause of action is ambiguous and no relief is requested. Having examined the record before us, we find the trial court did not abuse its discretion in denying the motion to amend the Complaint and, therefore, we find no merit to this first assignment of error.

## II. Motion in Limine

[2] The plaintiff's second assignment of error asserts that the trial court erred in granting the defendant's motion in limine to suppress all alleged oral misrepresentations made by Mark Parker. In support of this contention, the plaintiff argues (A) that Mark Parker was not an agent of OBFS at the time he made the oral misrepresentations and, therefore, had no authority to bind OBFS, and (B) that the doctrine enunciated in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 86 L.Ed. 956 (1942), and its progeny does

not prohibit the admission of such evidence on the facts of the present case. We disagree.

## A.   Agency

Agency is the relationship that "arises from 'the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' " *Hayman v. Ramada Inn, Inc.*, 86 N.C. App. 274, 277, 357 S.E.2d 394, 397 (1987) (quoting *Colony Assoc. v. Fred L. Clapp & Co.*, 60 N.C. App. 634, 637-38, 300 S.E.2d 37, 39 (1993) (emphasis omitted) ). The presence of a principal-agent relationship is a question of fact for the jury when the evidence tends to prove it; a question of law for the trial court if the facts lead to only one conclusion. *Smock v. Brantley*, 76 N.C. App. 73, 75, 331 S.E.2d 714, 716 (1985).

In the present case, Mark Parker served as an officer and director of OBFS until, at the latest, April 1988. The oral misrepresentations at issue here were purportedly made in June 1988. We need not, however, decide whether the agency relationship had been properly terminated, nor if OBC had been properly notified of the termination, as we find below that, even if Mark Parker was acting as an agent of OBFS in June 1988, the *D'Oench, Duhme* doctrine bars any oral agreement he may have entered into with Mike Beacham and OBC.

## B.   *D'Oench, Duhme*

In the *D'Oench, Duhme* case, an Illinois bank executed a promissory note with D'Oench, Duhme & Co. solely because the bank did not want its records to reflect past due bonds sold to it by the Company. Receipts for the note, which were not contained in the bank's records, indicated: "This note is given with the understanding that it will not be called for repayment. All interest payments to be repaid." The Company made interest payments in order to "keep [the note] alive," and when the bank failed and the Federal Deposit Insurance Corporation [hereinafter FDIC] took over, the FDIC called the note due.

The Company attempted to defend against the FDIC's demand by pointing to the outside agreement as evidenced in the receipts. The Court, however, held that the Company could not use the side agreement as a defense. In so holding, the Court recognized a public policy to protect the FDIC "from misrepresentations made

to induce or influence the action of [the FDIC], including misstatements as to the genuineness or integrity of securities in the portfolios of banks which it insures or to which it makes loans." *D'Oench, Duhme*, 315 U.S. at 459, 86 L.Ed. at 963.

The *D'Oench, Duhme* doctrine was codified in 1950 at 12 U.S.C. § 1823(e) and provides as follows:

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e) (1991). The purpose served by the common law *D'Oench, Duhme* doctrine and by its statutory codification is the same, and the case law interpreting both are generally considered in tandem. *Beighley v. FDIC*, 868 F.2d 776, 784 (5th Cir. 1989). Therefore, our discussion in the present case consists of cases interpreting both the original *D'Oench, Duhme* case and those construing section 1823(e) as precedent. See *Baumann v. Savers Federal Savings and Loan Assoc.*, 933 F.2d 1506, 1515 (11th Cir. 1991), *cert. denied*, --- U.S. ---, 118 L.Ed.2d 543 (1992). Moreover, while the original *D'Oench, Duhme* scenario involved the FDIC, the doctrine has been expanded to protect all federal bank regulatory agencies. *See Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1106 (11th Cir. 1990); *Baumann*, 934 F.2d at 1515.

From its original application in the case of a fraudulent agreement between borrower and banker affecting a specific bank asset, the *D'Oench, Duhme* doctrine has undergone an expansive develop-

ment resulting in a rule that has been described as "startling in its severity." *Bowen v. FDIC*, 915 F.2d 1013, 1015 (5th Cir. 1990). *See also Beighley*, 868 F.2d at 784 (explaining that the doctrine bars outside agreements even where the borrower does not intend to deceive banking authorities, and, moreover, the underlying transaction need not be fraudulent). That rule has been articulated as follows:

> In a suit over the enforcement of an agreement originally executed between an insured depository institution and a private party, a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records.

*Baumann*, 934 F.2d at 1515. This considerable doctrinal extension has been effectuated to advance the policy considerations first articulated in the original decision. *Bowen*, 915 F.2d at 1015. Stated in its most basic form, that policy constitutes a recognition that the federal banking regulators must be able to rely on a failed financial institution's written records and its assets. *Victor Hotel Corp. v. FCA Mortg. Corp.*, 928 F.2d at 1077, 1083 (11th Cir. 1991). *See also Bell & Murphy & Assoc. Inc. v. Interfirst Bank Gateway, N.A.*, 894 F.2d 750, 752-3 (5th Cir. 1990) *cert. denied*, 498 U.S. 895, 112 L.Ed.2d 203 (1990) (stating that *D'Oench* evidences a federal policy to protect the federal regulator and the public funds which it administers against misrepresentations as to the assets in the portfolios of the banks which the banking regulator insures or to which it makes loans); *North Arkansas Medical Center v. Barrett*, 962 F.2d at 780, 788-89 (8th Cir. 1992) (stating the policy as being "to facilitate regulation and protect the FDIC from financial loss by assuring that the bank's financial condition can be assessed instantaneously; to assure that senior bank officials are aware of unusual transactions before the bank agrees to them; and to prevent collusion between bank employees and customers on the eve of a bank's failure"); *Texas Refrigeration Supply, Inc. v. FDIC*, 953 F.2d at 975, 979 (5th Cir. 1992) (stating that two considerations underlie this policy: (1) the protection of depositors and creditors over the interests of borrowers; and (2) the ease of understanding a bank's financial health because FDIC examiners need to be able to accurately assess the condition of a bank based on its books).

In the case at bar, OBC makes certain contentions in an effort to limit the reach of *D'Oench, Duhme* and its progeny. In so doing it presents this Court with a variety of issues to resolve in order to decide whether the *D'Oench, Duhme* doctrine required the granting of the defendant's motion in limine regarding Mark Parker's statements to Mike Beacham. These issues are (1) whether OBFS has standing to invoke the doctrine; (2) whether a creditor asserting an affirmative claim is subject to the doctrine; and (3) whether the doctrine is applicable to claims that would affect the general assets of the failed institution. We address each of these issues in turn.

### 1. OBFS has Standing to Assert the *D'Oench, Duhme* Doctrine

In the present case OBFS has sought to invoke the *D'Oench, Duhme* doctrine in an effort to suppress the alleged oral misrepresentations made by Mark Parker. It is undisputed that RTC would have standing to assert the doctrine, and that the doctrine applies to agreements made between a third party and a wholly owned subsidiary, such as OBFS, of the failed institution. *See Victor*, 928 F.2d at 1083 (stating that the receiver "has to rely on a financial institution's written records and its assets, such as wholly-owned subsidiaries, to determine solvency for regulatory purposes"); *Oliver v. Resolution Trust Corp.*, 955 F.2d 583, 585 (8th Cir. 1992) (recognizing that "the scope of the *D'Oench* doctrine includes financial interests held by wholly-owned subsidiaries of the failed institution"). OBC contends, however, that the *D'Oench, Duhme* doctrine may be invoked only by those entities established by the federal government for the purpose of overseeing banking institutions, or by the successors in interest to those entities.

To support its contention that OBFS cannot invoke *D'Oench, Duhme*, OBC points to *Baumann v. Savers Federal Savings and Loan Assoc.*, 934 F.2d 1506 (11th Cir. 1991). In that case, the RTC became conservator of Savers Federal Savings and Loan Association after the plaintiff had received a favorable judgment against the bank in the lower court. The *Baumann* Court ruled that the RTC could raise the *D'Oench, Duhme* doctrine for the first time on appeal as it had not had the opportunity to do so in the earlier proceedings. Because the defense in *Baumann* was not raised until RTC was made a party, OBC argues that the defense *could* not have been raised until RTC was made a party. *Baumann* does not directly indicate, however, whether *the bank* could have in-

voked the doctrine once it had been placed into receivership. Moreover, in holding as it did, the *Baumann* Court pointed to Congress' recognition that " '[t]he appointment of a conservator or receiver can often change the character of litigation . . . .' " quoting H.R. Rep. No. 54, 101st Cong., 1st Sess., 331 (1989) *reprinted in* 1989 U.S.C.C.A.N. 86, 127. A case involving a failed savings and loan takes on new significance, then, simply by a receiver being appointed, not by the receiver being substituted as a party to the action. *See Victor*, 928 F.2d at 1083 (allowing FCA to bring a motion for summary judgment based on the fact that the *D'Oench, Duhme* doctrine barred Victor's defenses). In fact, the *D'Oench, Duhme* doctrine "extends broadly to cover any secret agreement adversely affecting the value of a financial interest *that has come within the RTC's control as receiver* of a failed financial institution." *Oliver*, 955 F.2d 585 (emphasis added) (indicating that, although RTC was a party, that fact was not essential to the application of the doctrine).

The *D'Oench, Duhme* doctrine is not intended to protect the failed institution. However, once a federal entity such as the FDIC, RTC or FSLIC has been appointed receiver, the protection afforded by the doctrine, even if invoked by the savings and loan, benefits the federal regulator. We find, therefore, that it is consistent with the policy considerations represented by the doctrine to allow OBFS to invoke the doctrine in the present case.

## 2.    A Creditor Asserting an Affirmative Claim is Subject to the *D'Oench, Duhme* Doctrine

OBC next asserts that the *D'Oench, Duhme* doctrine is available only in those situations where a borrower is seeking to defend against the regulator's calling due a debt evidenced in the failed bank's records. While it is true that the majority of instances in which the doctrine was invoked involved a bank borrower, "the policies implicit in [the *D'Oench, Duhme* doctrine and its statutory counterpart] require no . . . distinction [between borrower and creditor]." *North Arkansas*, 962 F.2d at 788. *See also Adams v. Madison Realty & Development, Inc.*, 937 F.2d 845 (3d Cir. 1991) (stating that there is no indication that the doctrine is limited to obligations between a borrower and the bank); *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 382 (11th Cir. 1991) (rejecting the plaintiff's assertion that *D'Oench* applies only to the maker of a note and pointing to a variety of situations outside the borrower-

lender arrangement in which *D'Oench* has been applied); *Hall v. FDIC*, 920 F.2d 334, 340 (6th Cir. 1991), *cert. denied*, 115 L.Ed.2d 1020 (1991) (stating that if *D'Oench* did not apply to bar the introduction of evidence of a side agreement relating to an affirmative claim against the receiver, "then an obligor could circumvent the sound policy behind *D'Oench* by asserting as a counterclaim that which could not be asserted as an affirmative defense"); *Beighley*, 868 F.2d at 784 (stating that " 'if [an] obligor may assert oral side agreements reducing the value of assets formerly held by the bank, then the FDIC would be misled.' " (quoting *Chatham Ventures, Inc. v. FDIC*, 651 F.2d 355, 361 (5th Cir. 1981), *cert. denied*, 456 U.S. 977, 72 L.Ed.2d 845 (1982) ). Furthermore, "[t]he goal of enabling regulators to make accurate assessments would be undercut by exempting claims from [the doctrine] simply because they did not pertain to the bank's lending function. The FDIC's picture of the bank's net worth could be just as distorted by hidden liabilities to creditors as by secret agreements that impair the value of a loan." *North Arkansas*, 962 F.2d at 789.

The scope of the *D'Oench, Duhme* doctrine is expansive and as such "extends broadly to cover *any* secret agreement adversely affecting the value of a financial interest that has come within [the federal regulator's] control as receiver of a failed financial institution." *Oliver v. RTC*, 955 F.2d at 583 (emphasis added). The developmental history of the doctrine dictates that the most important consideration is whether "one who has dealt with a failed [federally]-insured institution [is asserting] a claim or defense against the [federal regulator] that depends on some understanding that is not reflected in the insolvent bank's records." *Texas Refrigeration Supply v. FDIC*, 953 F.2d 975, 978-79 (5th Cir. 1992). As such, *D'Oench, Duhme* applies to "any agreement that 'tends to defeat or diminish [the receiver's] right to an interest' in receivership" not only those between borrower and banker. We find, therefore, that it is consistent with the general policy considerations underlying the *D'Oench, Duhme* decision, and supported by case law from the circuit courts, to apply the doctrine to the claims of OBC, as a potential creditor of OBFS, in the present case. *Victor Hotel Corp. v. FCA Mortgage*, 928 F.2d at 1083 (quoting *FDIC v. Hoover-Morris Enterprises*, 642 F.2d 785 (5th Cir. 1981) ).

3.  The *D'Oench, Duhme* Doctrine is Applicable to Claims that
    would Affect the General Assets of the Failed Institution

OBC next contends that the doctrine does not preclude recovery
based on breach of fiduciary duty because breach of fiduciary duty
is a tort claim rather than a contract claim. As such, the claim
constitutes an action against the general assets of OBFS, and OBC
asserts that *D'Oench* only applies where a specific asset is con-
cerned. However, "to the extent that . . . [a] breach of fiduciary
duty claim is based on the asserted side agreements, the claim
is barred by the *D'Oench* doctrine." *Oliver*, 955 F.2d at 586. *See
Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d
46 (1st Cir. 1991) (rejecting the proposition that *D'Oench* does not
bar affirmative claims sounding in tort because such a proposition
is contrary to *D'Oench's* policy of protecting the FDIC from secret
agreements). Furthermore, the agreement sought to be invalidated
by the doctrine "need not implicate a specific obligation, such as
a note or other asset held by the FDIC . . . . Simply put, transactions
not reflected on the bank's books do not appear on the judicial
radar screen either." *Bowen*, 915 F.2d at 1016. *See also Hall*, 920
F.2d at 339 (concluding that while in most cases which rely on
*D'Oench* the FDIC does have an interest in a specific asset, the
doctrine may be invoked even where FDIC does not have an in-
terest in an asset because its importance arises from allowing bank-
ing authorities to determine exactly what a bank's assets are).
*But see Vernon v. RTC*, 907 F.2d 1101, 1108 (11th Cir. 1990) (declin-
ing to extend the *D'Oench, Duhme* doctrine to cover tort claims
against the general assets of the failed institution, believing such
action to be "both inappropriate and unnecessary.").

The relevant question in determining whether the *D'Oench,
Duhme* doctrine acts to bar a claim is whether the private party
lent himself to a scheme or arrangement whereby the relevant
authorities were likely to be misled. *Bell & Murphy*, 894 F.2d
at 753-54. If, therefore, a claim sounding in tort and seeking recovery
against the general assets of the failed institution arises from such
a scheme or arrangement, the *D'Oench, Duhme* doctrine bars
evidence supporting that claim. "As between private parties and
federal deposit insurance agencies, both Congress and the Supreme
Court have placed the burden on private parties to document fully
the contours of their obligations from the inception of the transac-
tion." *Baumann*, 934 F.2d at 1517.

CHESAPEAKE MICROFILM v. N.C. DEPT. OF E.H.N.R.

[111 N.C. App. 737 (1993)]

In the case at bar, the claim asserted by OBC stems from alleged misrepresentations made by Mark Parker on behalf of OBFS which are not recorded in the bank's records. Because Mark Parker's statements constitute a side agreement that could easily have been put into writing and made part of the bank's records, and because that agreement tended to mislead the RTC when it, as receiver of OBFS, examined the bank's records in an effort to ascertain its value, we find that those statements are prohibited by the *D'Oench, Duhme* doctrine from being introduced at trial.

We note that OBC argues that the *D'Oench, Duhme* doctrine is inapplicable to the case at bar and that, instead, state lien law should be applied to the facts presented in order to decide the merits of this case. However, while OBC did give notice of appeal from the judgment entered by Judge Watts, it assigned error only to the denial of the motion to amend its Complaint and to the granting of OBFS' motion in limine. These are, therefore, the only two issues before this Court and any issues relating to the state lien laws and their potential application to the facts of this case are beyond the scope of our review. *See* N.C.R. App. P. 10(a).

For the foregoing reasons, we conclude that the denial of the motion to amend the complaint did not constitute an abuse of discretion and that the motion in limine was properly granted. The decision of the trial court is, therefore,

Affirmed.

Judges EAGLES and COZORT concur.